**UNITED STATES of America, Appellee,**

v.

**Benjamin MALLAH et al., Appellants.**

**Nos. 1141, 1103, 1165 and 1176 Dockets 74–1327, 74–1339, 74–1328 and 74–1499.**

United States Court of Appeals, Second Circuit.

Argued June 21, 1974.

Decided Sept. 23, 1974.

Gerald L. Shargel, New York City (La Rossa, Shargel & Fischetti, New York City, James M. La Rossa, New York City, of counsel), for appellant Mallah.

Nancy Rosner, New York City (Rosner, Fisher & Scribner, New York City, Alan F. Scribner, New York City, of counsel), for appellant Catino.

Steven B. Duke, New Haven, Conn., for appellant Pacelli.

James P. Lavin, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., for the Southern District of New York, Lawrence S. Feld, Asst. U. S. Atty., of counsel), for appellee.

Before SMITH and MANSFIELD, Circuit Judges, and BARTELS,* District Judge.

J. JOSEPH SMITH, Circuit Judge:

Benjamin Mallah, Vincent Pacelli, Jr., Alfred Catino and Barney Barrett appeal from judgments of conviction entered on February 26, 1974 and March 15, 1974, after a jury trial in the Southern District of New York, Milton Pollack, Judge. The jury found all four appellants guilty of conspiring to violate the federal narcotics laws and also found Pacelli guilty of two substantive narcotics offenses and Catino guilty of one such offense. We affirm in part and reverse in part.

The four appellants were charged with participating together with forty-two other named co-conspirators in a conspiracy to distribute large amounts of heroin and cocaine in New York. Pacelli, Catino and Mallah were also charged with substantive offenses. Eleven members of this conspiracy were tried and convicted on July 12, 1973 (the *Sperling* trial), and these convictions are presently on appeal to this court. Five of the named co-conspirators were tried below. Appellant Pacelli was originally a defendant in the *Sperling* trial, but he was granted a severance at the end of the government's case there. Appellant Mallah was apprehended subsequent to the *Sperling* trial. Catino, Barrett and Alfred DeFranco were added as defendants in the superseding indictment.

The evidence at this trial established that appellant Pacelli and co-conspirator Herbert Sperling were the central figures within a large organization engaged in distributing heroin and cocaine in New York and that appellant Mallah acted as banker to the operation. The proof against appellants Catino and Barrett showed them to be lesser figures in the organization. The jury found Pacelli innocent of three substantive counts and completely exonerated DeFranco, who had been charged with one count of conspiracy and one substantive count.

Appellants raise numerous points on appeal, one of which requires the reversal of one count of the convictions below.

## A. MALLAH

Appellant Mallah contends that there was insufficient evidence, independent of hearsay statements by co-conspirators, to tie him to the criminal venture. The thrust of Mallah's defense was that he did associate with the conspirators, but only in his capacity as their bookmaker. Thus, he explains the evidence of the passage of large sums of money to and from him and the conspirators (chiefly Sperling) as incident to gambling activity rather than to drug dealings. Citing United States v. Di Re, 159 F.2d 818 (2d Cir. 1947), aff'd, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), he concludes that the government failed to show more than mere association with criminals.

This argument cannot withstand the weight of the independent evidence. Cecile Mileto, wife of co-conspirator Louis Mileto, testified that she saw packages containing white powder piled on a table in Sperling's apartment, in Mallah's presence, and that Mallah asked Sperling, "Are you going to have enough money for this?" On another occasion, a police officer concealed in the trunk of a Cadillac El Dorado parked in front of the organization's barbershop front overheard the following conversation between Sperling and Mallah, who had just emerged from the shop:

> Sperling: "I got to have the stuff."
>
> Mallah: "Don't worry about it."
>
> Sperling: "Fifty thou, right."
>
> Mallah: "Yes, right, fifty-fifty."
>
> Sperling: "But I got to have it. You know I need it."
>
> Mallah: "Don't worry about it. I'll see the people this afternoon, tonight

* Senior United States District Judge for the Eastern District of New York, sitting by designation.

or early tomorrow. You should have it."

Sperling: "But I need it."

Mallah: "Don't worry about it. If the people were straight, if they are not on the run we should have it."

On a third occasion, Mallah was seen leaving Sperling's apartment carrying a shoe box wrapped in distinctive paper minutes after co-conspirators Mileto and Joseph Conforti had delivered that box, containing proceeds from a narcotics transaction, to Sperling. There also was evidence that Mallah fled when he heard that some members of the conspiracy had been arrested.

Taken together, these pieces of evidence constitute a sufficient showing that Mallah associated himself with the criminal venture charged. United States v. Calabro, 449 F.2d 885, 889–891 (2d Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972).

■ Mallah's second point on appeal is that the evidence adduced below established two, distinct conspiracies, if any: one, led by Sperling, dealing in heroin; the second, led by Pacelli, dealing in cocaine. But while the evidence did indicate that the co-conspirators often moved in two groups, there was sufficient indicia of criminal partnership —including common direction from the core conspirators, commingling of assets, mutual dependence, and common business offices—to link the two groups together. As in a firm with a real estate department and an insurance department, the fact that partners bring in two kinds of business on the basis of their different skills and connections does not affect the fact that they are partners in a more general business venture. Each of the defendants must have been aware that he was participating in a scheme in which there were many suppliers and purchasers of both heroin and cocaine. The jury was entitled to find that the defendants belonged to the

same firm. United States v. Bynum, 485 F.2d 490, 495 (2d Cir. 1973), vacated and remanded on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); United States v. Arroyo, 494 F.2d 1316 (2d Cir. 1974).

Appellant next contends that he was improperly limited in attempting to contradict the testimony of Joseph Conforti, an accomplice witness. Conforti admitted on direct examination that he had called Sam Kaplan, a defendant in the *Sperling* trial, on the orders of co-conspirator/fugitive Jack Spada, to tell Kaplan that Kaplan should pay Spada $10,000 or else Conforti would testify about a narcotics transaction involving Kaplan.[1] Conforti testified that Kaplan told him that he, Kaplan, had no money, and that Conforti relayed this to Spada who told Conforti not to worry about it. Thus, Conforti admitted to participating in a scheme to extort money from a defendant in a criminal trial by threatening him with prejudicial testimony.

Appellant wanted more. He wanted to introduce a tape recording of the Conforti-Kaplan conversation and also extrinsic evidence to the effect that Spada had died[2] prior to the Conforti-Kaplan conversation. With this, appellant hoped to prove that Conforti acted on his own in this extortion plan and not as Spada's agent. Judge Pollack refused to allow this evidence to be introduced, ruling that it was collateral.

■■ The court did not err in excluding this evidence. Although extrinsic evidence is admissible to show a special motive to lie or fabricate a case against a defendant, United States v. Kinnard, 150 U.S.App.D.C. 386, 465 F.2d 566 (1972); United States v. Haggett, 438 F.2d 396 (2d Cir.), cert. denied, 402 U.S. 946, 91 S.Ct. 1638, 29 L.Ed.2d 115 (1971), the evidence in dispute here is not probative in that respect. The extortion scheme was directed against Sam Kaplan, not against any of the defendants in this case. Thus, this disputed

---

1. In fact, Conforti did not so testify, and Kaplan was acquitted.

2. Spada was found riddled with bullets and with both hands hacked off at the wrists.

evidence is more fairly seen as inadmissible, extrinsic proof of Conforti's bad character. United States v. Glasser, 443 F.2d 994, 1002–1003 (2d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed. 2d 95 (1971); United States v. De Sapio, 456 F.2d 644, 648, n. 1 (2d Cir.), cert. denied, 406 U.S. 933, 92 S.Ct. 1776, 32 L.Ed.2d 135 (1972). Moreover, Conforti's admission to participating in the extortion plot shed a good deal of light on his credibility. The disputed evidence would have added little additional candle power but, considering the confused and obscene character of the taped conversation and the fact that the evidence concerning the date of Spada's death would have been protracted, might well have distracted the jury.

■ Appellant complains of a second instance in which the court limited his right to impeach a government witness, the cross-examination of Barry Lipsky. Lipsky was a key government witness, an accomplice witness who had been Pacelli's right-hand man. On direct examination, Lipsky testified to the criminal involvement of each of the appellants and admitted to his own involvement in criminal activity. On cross-examination, the court refused to permit appellant to question Lipsky concerning the details of one of his crimes, the murder of Patsy Parks.

In February, 1972, a few days before the scheduled trial of an indictment against appellant Pacelli on a different narcotics charge, federal agents attempted to serve a subpoena on Parks, who had testified before the grand jury which issued the indictment. Upon learning that the agents sought her, Parks went to the Hippopotamus Discotheque in New York where she told Lipsky that she urgently wanted to see Pacelli about the subpoena. Lipsky immediately taxied to New Rochelle to inform Pacelli about this development, and

there the two men decided that the proper course of action was to kill Parks. They drove back to Manhattan, stopping on the way to purchase four one-gallon cans of gasoline. Pacelli and Lipsky then took the prospective government witness for her last ride. According to Lipsky's testimony at Pacelli's trial for the killing, Lipsky replaced Pacelli at the wheel and Pacelli stabbed her repeatedly in the throat, saying "Die, you bitch." Lipsky then drove to a wooded area where they poured the gasoline over the body and set it on fire.

Lipsky was indicted for murder in Nassau County and confessed to the crime. He wrote to federal authorities, suggesting an exchange of narcotics information for federal assistance on the state charge. Before the negotiations began, the state apparently refused to consider allowing Lipsky to plead to a lesser charge than first degree murder; after intervention by the federal government, Lipsky was permitted to plead guilty to manslaughter in the first degree and received an indeterminate sentence of twenty years in prison for which parole was immediately available.[3]

At the trial below, appellant sought to cross-examine Lipsky about the details of the Parks murder. The court, however, restricted the examination only to the fact of the indictment, plea and sentence, and the aid given by the federal government in obtaining the plea. Appellant now contends that this restriction deprived him of a fair trial in that (1) the jury could not appreciate the extent of the government's consideration to Lipsky nor the extent of his motive to testify for the government unless they understood that the crime was a premeditated and brutal murder of a government witness rather than one which involved even the slightest of extenuating circumstances, and (2) the details of the

---

3. Appellant Pacelli was convicted in the Southern District of New York of conspiring with Lipsky to deprive Parks of her civil rights by killing her. Lipsky testified against Pacelli. This conviction was reversed in United States v. Pacelli, 491 F.2d 1108 (2d Cir. 1974).

crime bear on Lipsky's sanity, a factor which is relevant to his credibility.

While the details of the murder are relevant both to Lipsky's motivation and to his mental competence, the introduction of this evidence might well have confused the jury and might also have prejudiced the case against appellant Pacelli, whose involvement in the murder could have been revealed in the telling. Moreover the jury did have before it sufficient evidence concerning Lipsky's credibility to make a discriminating appraisal of him.

During both direct and cross-examination, Lipsky admitted to testifying falsely before a Florida grand jury in 1970, lying to a probation officer in Florida, having been convicted in Miami of conspiring to transport stolen securities in interstate commerce, lying to the sentencing judge, testifying falsely as to promises made to him in two trials involving appellant Pacelli in the Southern District of New York in 1972, having used as well as distributed cocaine, receiving promises that he would not be prosecuted for his narcotics activities, and to his expectations that he would not be prosecuted for past acts of perjury or tax evasion or for defrauding a person of $20,000 in Miami in 1970. Lipsky also conceded that on occasion he beat his head against walls, that he had once fired a gun at a television set when its vertical hold needed adjustment, that he had thrown a scale into the ocean when it did not show that he was losing weight, and that he frequently placed random calls in the name of a Mr. Graves, who was an announcer on his favorite horror television show in Miami.

The jury clearly understood the import of this evidence. Co-defendant DeFranco was implicated in the narcotics dealings by Lipsky in the same way that appellant Catino was implicated. Indeed, Lipsky testified that in one of the several transactions involving DeFranco, DeFranco personally gave Lipsky the keys to the car in which Lipsky was to place the drugs and Lipsky personally returned the keys of the then drug-laden car to DeFranco. Yet, despite Lipsky's clearly inculpatory testimony against DeFranco, the jury acquitted DeFranco after sending a note to the court asking, "Please let us know if anyone other than Lipsky testified against DeFranco. If there is other testimony, may we have it?" and on receiving the answer that Lipsky was the only witness against DeFranco. Pacelli, too, was acquitted on substantive counts where Lipsky was not corroborated.

The jury had before it evidence which called Lipsky's credibility into serious question. Defense counsel stressed this evidence in summation, and the judge instructed the jury that Lipsky's testimony was "inherently suspect." The dispositions indicate that the jury was wary of Lipsky's account. In light of these factors, the restriction appears to have been neither prejudicial nor erroneous.

■ Appellant's fifth argument concerns the prosecutor's summation. Lipsky had testified on direct examination to a sale in Yellowfingers Restaurant involving Pacelli. On cross-examination, Lipsky admitted that he had testified at the *Sperling* trial to a second sale in Yellowfingers involving Pacelli and co-conspirator Luis Valentine, who was convicted in the *Sperling* trial. Defense counsel then introduced testimony given in the *Sperling* trial by a police officer, since deceased, in which the officer stated that he surveilled Yellowfingers on the day the second sale supposedly occurred and that while he observed Lipsky, Valentine and several other people there that day he did not see Pacelli. In summation, Mr. Duke, Pacelli's counsel, argued that the reason why Lipsky had not testified in this trial about that second sale in Yellowfingers was that if he had so testified the testimony of the officer would have proved him a liar as it had in the first trial. The prosecutor responded:

I recall Mr. Duke told you on one occasion that he read some testimony yesterday into the record that was

about a surveillance of a Valentine buy at the Yellowfingers Cafe, and he read the whole thing, and he said his conclusion was that Mr. Lipsky did not testify about that at this trial because he had found out that he was under surveillance.

Well, the reason that he didn't testify about it at that trial was that those persons were already convicted, as Mr. Duke well knew, and there was no reason to testify.

Appellant contends that this remark deprived him of a fair trial: it advised the jury that other persons involved in the conspiracy charged had been convicted of such involvement. Appellant Pacelli makes the further point that the prosecutor's remark suggested to the jury that Pacelli himself had been convicted of participation in the conspiracy because Mr. Duke was Pacelli's counsel.

The government concedes that the remark was improper, as indeed it was. The prosecutor could have responded to Mr. Duke's argument by noting that there was no need for Lipsky to testify concerning the second sale because most of those who participated in that sale were not on trial here. To the extent that this represents an incomplete answer, the government should have remained silent. Mr. Duke's point was well taken. Neither can the remark be justified as an instance of fighting fire with fire. United States v. LaSorsa, 480 F.2d 522, 525–526 (2d Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973). Although Mr. Duke's summation was in good part accusatory,[4] the suggestion of previous convictions reflected on the other defendants as well, and their summations were not so vitriolic. The government would do well to avoid such a suggestion in the future. *See,* United States v. Drummond, 481 F.2d 62 (2d Cir. 1973); United States v. Miller, 478 F.2d 1315 (2d Cir. 1973); United States v. Fernandez, 480 F.2d 726, 741 (2d Cir. 1973); United States v. Gonzalez, 488 F.2d 833 (2d Cir. 1973).

The court recognized the error and immediately cautioned the jury:

Ladies and Gentlemen, it is my duty again, despite the fact that I have said this before, you are admonished, you are instructed, you are implored, using any word that I can indicate to you, to erase from your minds any of the argument of counsel on either side, and particularly that last comment which has nothing and no support in the evidence. It is the evidence in this case which governs, and nothing which has run outside of the evidence and there have been indications on both sides now of a comment which should not have been made that doesn't relate to the evidence.

Let's get on with the evidence Mr. Lavin, and your comments about the evidence, and not things that are not in evidence. Let's not have it happen again.

Moreover, the context of this remark cushioned its impact. Appellants' defenses were not that no conspiracy existed but that they were not part of it. If a conspiracy in fact existed, someone must be guilty of it. If others had already been found guilty, perhaps these defendants were innocent. This reasoning is, of course, speculative. But it is no less speculative to argue that the error deprived appellants of a fair trial. The error here was isolated, its prejudicial effect dependent upon a chain of reasoning which was not obvious, the court immediately cautioned the jury, and the evidence against each of the appellants was considerable. Moreover the jury acquitted a codefendant on all counts. While remarks in the prosecution's summation concerning convictions in related cases deserve special scrutiny, we conclude that this remark did not deprive appellants of a fair trial.

---

4. In his summation, Mr. Duke stated that Lipsky and an Assistant United States Attorney were "a couple of crooks" and that the only conspiracy proven at the trial was one between Lipsky and that Assistant to obstruct justice and commit perjury.

■ Appellant's remaining contentions deserve less attention. He argues that Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) requires that his conviction on the conspiracy count be reversed because it is inconsistent with the dismissal below of the substantive count at the close of the government's case. Since under Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180, 90 L.Ed. 1489 (1946), Mallah is liable substantively for offenses committed in furtherance of the conspiracy of which he is proven to have been a part, dismissal of the substantive count does appear to be inconsistent with a judgment of conviction on the conspiracy count. However, this inconsistency does not deprive appellant of his rights. Mallah cannot rely on *Ashe,* as Mallah was not exposed to jeopardy twice: Judge Pollack could only acquit, he could not convict. "[T]he principle that bars relitigation between the same parties of issues actually determined at a previous trial" *Ashe,* 397 U.S. at 442, 90 S.Ct. at 1193, is simply not applicable where there has been no previous trial. The inconsistency could not have prejudiced appellant, and it may well have benefited him.

■ Appellant argues that it was error to introduce evidence of a heroin transaction which occurred on February 10, 1972 between co-conspirator Paul Carter and narcotics agent Pope. Pope testified that Carter obtained the heroin from co-conspirator Mark Reiter, who in turn got it from Louis Mileto. Appellant argues that since the evidence showed that Sperling disapproved of this transaction, apparently because he was feuding with Reiter, the transaction was not "in furtherance of the conspiracy." But the only thing which distinguished this transaction from the many others made "in furtherance of the conspiracy" was that Mileto received less than his customary "take" because he disobeyed Sperling's instructions. There was no evidence that Sperling attempted to rescind the sale. The jury could reasonably have found that the transaction was in furtherance of the conspiracy charged.

■ Finally, Mallah relies on United States v. Puco, 476 F.2d 1099 (2d Cir.), cert. denied, 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973), for the proposition that the admission of testimony by accomplice witnesses Lipsky and Conforti to the effect that other members of the conspiracy (Pacelli and Mileto, respectively) told them that Mallah was a partner in the conspiracy violated his right to confrontation. But where the declarant and the listener witness know each other to be members of the conspiracy at the time the statement is made, there is no reason to doubt the veracity of the testimony, and *Puco* does not bar its introduction into evidence.

## B. CATINO

Appellant Catino joins in several of the arguments discussed above. We reject these claims for the reasons noted. Catino also objects to the introduction of certain evidence.

■ When appellant was arrested outside his home on September 26, 1973, six days after the indictment in this case was handed up, he was carrying a paper bag which contained eight thermometers. These thermometers were introduced into evidence, the government arguing that they were narcotics paraphernalia. The defense established that the thermometers seized had a maximum reading of 148 degrees centigrade, and that heroin "breaks" at 240 degrees centigrade if pure and at below 190 degrees if cut. Thus the defense argued that these thermometers were not useful in the narcotics trade, and its expert witness testified as to their other possible uses. The government argued in summation that Catino had mistakenly purchased the wrong type of thermometer (Fahrenheit rather than centigrade). Catino now contends that the thermometers should not have been introduced, on the theory that they were relevant only to his criminal character or disposition. United States v. Smith, 283 F.2d 760 763 (2d Cir. 1960), cert. denied, 365 U.

S. 851, 81 S.Ct. 815, 5 L.Ed.2d 815 (1961); United States v. DeCicco, 435 F.2d 478 (2d Cir. 1970).

Clearly, appellant's possession of the eight thermometers is relevant to his state of mind, his intent, in respect to the conspiracy. United States v. Cohen, 489 F.2d 945 (2d Cir. 1973); United States v. Nathan, 476 F.2d 456, 459–460 (2d Cir. 1973); United States v. Del Purgatorio, 411 F.2d 84, 86–87 (2d Cir. 1969). The thrust of appellant's comments at oral argument was that the possession was too remote to be admissible on this theory. But we cannot say that activity which takes place six days after the conspiracy ended is so remote that evidence of that activity must be excluded. To the extent that appellant's argument focuses on the fact that the thermometers were Fahrenheit rather than centigrade, this was a matter for the jury. Appellant forcefully argued the point to the jury, and the government conceded much of the argument. But the jury could reasonably have found, as they appear to have found, that Catino did err in buying the thermometers or that the thermometers were useful to the conspirators as a minimal check for quality control.

■ Catino's final point is that Lipsky should not have been permitted to testify against him because Lipsky was an incompetent witness. He contends that because Lipsky admitted to lying at three other criminal trials and having not been and not expecting to be prosecuted for that perjury, Lipsky had no respect for the oath and was therefore incompetent to testify. But it does not follow from this previous experience that Lipsky's testimony below was untrue. Moreover, "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966). Lipsky was subject to intense cross-examination in which his prior perjury and his present expectations of immunity were exposed. The trial judge told the jury that Lipsky's testimony was "inherently suspect." As noted, these safeguards appear to have had the intended effect.

### C. BARRETT

Appellant Barrett raises no issues which have not been dealt with above.

### D. PACELLI

Appellant Pacelli does not rely on the customary challenges to evidentiary rulings and factual findings. His appendix is replete with excerpts not from the trial transcript, but from correspondence with the United States Attorney, taped conversations between counsel and the United States Attorney, copies of previous indictments against Pacelli and transcripts of various hearings in related cases; it is, he complains, bursting with the poison of prosecutorial vindictiveness. And, indeed, Pacelli and the U. S. Attorney's Office of the Southern District of New York have a history of chronic conflict.

In February, 1972, Pacelli was convicted in federal court, Southern District of New York, of participating in a conspiracy to violate the narcotics laws and of two substantive narcotics violations. The conviction was affirmed; United States v. Pacelli, 470 F.2d 67 (2d Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973). Lipsky did not testify at this trial, which we will call *Pacelli I*.

In June, 1972, Pacelli was convicted in the Southern District of New York of participating in another narcotics conspiracy and of substantive counts. At this trial, *Pacelli II*, Lipsky testified against Pacelli and stated that the government had made him no promises in exchange for his testimony.

In December, 1972, while the appeal in *Pacelli II* was pending, Pacelli was tried on new, substantive narcotics charges. Again, Lipsky testified and denied having been promised anything by the government. This time, however, defense counsel disclosed to the court a tape recording of a conversation between Lip-

sky, Lipsky's counsel and an Assistant United States Attorney in which Lipsky was promised on April 11, 1972, that he would not be prosecuted for "any information that comes out of his mouth, this case or any other case." As a result of this disclosure, *Pacelli II* was remanded to the district court, where that judgment was vacated, and a mistrial was declared in the December, 1972 case, *Pacelli III.*

In May, 1973, Pacelli was convicted in the Southern District of New York of conspiring to deprive Patsy Parks of her civil rights by killing her. Lipsky testified against Pacelli, this time informing the jury of the government's promise. This court reversed this conviction primarily on the ground that the government had failed to disclose valuable Jencks Act material to Pacelli. United States v. Pacelli, 491 F.2d 1108 (1974). This was *Pacelli IV.*

In July, 1973, Pacelli went to trial in the *Sperling* case. After two weeks of trial, he was severed because he was needed as a witness for several co-defendants.

The trial below is thus *Pacelli VI.* Pacelli was first arrested in February, 1972. He is presently in federal prison where he is serving a twenty-year sentence based on his conviction in *Pacelli I.* He challenges his conviction below on the conspiracy count and on the two substantive counts, largely on the basis of this prior history.

*The Conspiracy Count*

Pacelli contends that he has been convicted twice of the same offense, in that his conviction below on the conspiracy count and his conviction of conspiracy in *Pacelli I* are identical.

In *Pacelli I,* Pacelli was charged with conspiring with Demetrios Papadakos, a/k/a James Pappas, Beverly Jalaba, Elisa Possas and "others to the Grand Jury unknown" to violate the federal narcotics laws from January 1, 1971 to June 14, 1971. The overt acts were alleged to have taken place in New York City in May, 1971. The proof indicated that Papadakos, Pappas and Jalaba were underlings in the scheme, but did not suggest anything about the scope of the venture beyond the transactions specified as overt acts. Below, Pacelli was charged with conspiring with Mallah, Catino, Barrett, DeFranco, Ismael Torres, Peter Salanardi, Courtland Sample, a/k/a "Bucky," Albert Perez, a/k/a "Abbe," Al Bracer, Edgardo Ramirez, Jack Spada, John Fazzalardi, a/k/a "Fuzzy," Herbert Sperling, Joseph Conforti, Louis Mileto, Barry Lipsky, and "others to the Grand Jury known and unknown," to violate the federal narcotics laws from January 1, 1971 to September 23, 1973. The overt acts were alleged to have taken place in New York City between July, 1971 and January, 1973. The proof established a large-scale conspiracy to distribute heroin and cocaine in the New York area, with Pacelli near the core of the organization and a large staff beneath him. In the bill of particulars below, the government named twenty-nine further unindicted co-conspirators.[5]

The government contends that because there were no named co-conspirators

---

5. They were:
Norman Goldstein, a/k/a "Sonny Gold"
Jack Bless
Edward Bless
Nicholas Cuccinello, a/k/a "Lucky Red"
Cecile Sperling
Juan Serrano, a/k/a "John Negron"
Frank Bassi, Jr.
Antoinette Bassi
Fred Berger
Frank Serrano
Luis Valentine, a/k/a Ramon Lombardero
Reginald Williams
Octavio Del Busto
Nelson Garcia
Susan Ueyl
Salvatore Ruggiero
Edward Peter Schworak
John Ramos
Carlo Lombardi
John Capra, a/k/a "Hooks"
Stephen Delacava, a/k/a "Beansie"
Leo Guarino
Carlo Lombardi
Nicholas Lugo
Peter Aponte
Albert Gonzalez
Paul Carter
Mark Reiter
John Caruso

common to the two indictments, because different overt acts were alleged in each indictment, because the conspiracy below continued into 1973 whereas the conspiracy in *Pacelli I* ended in May, 1971, and because there is a suggestion in *Pacelli I* that that conspiracy extended to distributing narcotics to customers in the Midwest whereas the proof below established activity only in New York, the two conspiracies are distinct.

This reasoning is undercut by several factors. First, the *Pacelli I* indictment specified that Pacelli, Papadakos, Possas and Jalaba conspired with "others unknown to the Grand Jury." Therefore, the non-identity of the named conspirators does not establish that there was no overlap in personnel other than Pacelli. Second, the proof below established that Pacelli was at or near the center of a large-scale, far-flung narcotics organization and therefore suggests the possibility that the others "unknown to the Grand Jury" involved in *Pacelli I* were members of the conspiracy proven below. Again, it is quite possible that prosecutorial discretion alone explains the distinctness of the overt acts alleged. As the prosecutor argued in part in summation, there was no need to prove acts relating to other conspirators not on trial below. Thus, the overt acts specified in the indictment in *Pacelli V* (the *Sperling* trial) are not identical to those specified in the indictment below although the government concedes that they are the same conspiracy.[6] Neither are the dates of the two conspiracies truly distinct. Both were alleged to have commenced in January, 1971 and to have operated through May, 1971. The fact that both conspiracies were alleged to have operated in New York City, indeed that the overt acts were alleged to have taken place only a matter of a few miles from each other, strengthens the suggestion that the two conspiracies are really one. While New York City is large enough to harbor two simultaneous narcotics conspiracies, one of the two charged here is of a scale such that it is likely to have been known to those in the business in New York, and the participation of a core conspirator in that large operation in a series of narcotics transactions raises an inference that it is that large operation that is at work.

In short, it is very possible that Papadakos, Pappas and Jalaba recognized that they were part of the Pacelli/Sperling organization rather than having an independent existence and identity of their own.

Indeed, had Papadakos, Possas and Jalaba been tried together with Pacelli, Mallah, Catino, Barrett, et al., and had all the evidence presented in *Pacelli I* and in the trial below been introduced against them, it seems clear that the defendants could not successfully have objected that the proof established multiple conspiracies rather than a single conspiracy. One who deals in large amounts of narcotics is held to the knowledge that there is a large criminal organization which is making that deal possible, and one is liable as a co-conspirator even though one has no personal knowledge of the identity of many of the co-conspirators. United States v. Bynum, 485 F.2d 490, 495 (2d Cir. 1973), vacated and remanded on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); United States v.

6. The conspiracy count in the *Pacelli V* indictment alleged two overt acts in which Pacelli took part. One alleged a delivery of one kilogram of cocaine by Juan Serrano to Pacelli in August, 1971; the other alleged a delivery of two kilos of heroin by Sperling to Pacelli in November, 1971. The conspiracy count in the instant indictment alleged three overt acts involving Pacelli. One is the November, 1971 Sperling delivery alleged in the *Pacelli V* indictment. The second alleged a delivery of two kilos of heroin by Pacelli to Catino and John Fazzalari in September, 1971. The third alleged a one kilo heroin delivery by Pacelli to DeFranco and Fazzalari in December, 1971. This difference cannot be explained by the fact that the persons on trial in the *Sperling* trial were not on trial below because the indictment below did include an allegation of a Pacelli-Sperling transaction while Sperling was not a defendant below.

Arroyo, 494 F.2d 1316 (2d Cir. 1974); United States v. Sisca, 503 F.2d 1337 (2d Cir. 1974); United States v. Cirillo, 499 F.2d 872 (1974). While defense counsel have argued that these cases represent a departure from the rule of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), to the effect that a defendant has a right not to be tried *en masse* for a conglomeration of distinct offenses committed by others, the *Bynum-Arroyo* line of authority only reflects judicial awareness of the fact that the narcotics business generally takes the shape of a joint criminal venture among many criminals. As Judge Mulligan has described it:

> The pattern is now familiar. Raw drugs in large quantities have to be imported and supplied. In this case the core operators Bynum and Cordovano, respectively, supplied the capital and the contact with the suppliers who provided the raw material. The raw drugs then had to be adulterated or cut, packaged and then resold to purchasers who eventually made them available to the victims. In more normal business ventures this would be described as a vertically integrated loose-knit combination. The point of course is that each level of the operation depends upon the existence of the other, and the mutual interdependence of each is fully understood and appreciated by the other. This knowledge on the part of Bynum and Cordovano operating in the middle layer is obvious. The supplier defendants Birnbaum, Altamura, Feroldi, Tuzzolina, Coniglio and Mele could not reasonably suppose that the large amounts of raw cocaine and heroin received by Bynum and Cordovano were not to be resold at the tremendous profits this business produces. The defendants Wright, Small, Mitchell, Garnett and Dyson who participated in the cutting, repackaging and distribution of the drugs understood fully the roles of Bynum and Cordovano and that suppliers of the raw drugs had to be involved. This is the usual chain conspiracy encountered in drug cases. "Thus the conspirators, at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers. That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each was a participant, and an abettor in the sense that the success of that part with which he was immediately concerned, was dependent upon the success of the whole." United States v. Tramaglino, 197 F.2d 928, 930 (2d Cir.), cert. denied, 344 U.S. 864, 73 S. Ct. 105, 97 L.Ed. 670 (1952), quoting United States v. Bruno, 105 F.2d 921, 922 (2d Cir.), rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939). See also Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); United States v. Vega, 458 F.2d 1234 (2d Cir. 1972); United States v. Agueci, 310 F.2d 817 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed. 2d 12 (1963). The fact that not all of the defendants may have known and worked directly with all of the others is not significant since it is clearly established that each knew from the scope of the operation that others were involved in the performance of functions vital to the success of the business. United States v. Calabro, 467 F.2d 973, 982–983 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973).

485 F.2d at 495–496.

Neither has the classical distinction between simple chain and hub-spoke conspiracies held up well in the area of narcotics conspiracy, for where two or more chains are connected to a hub by core conspirators this court has not hesitated to view the entirety as a single conspiracy. *Bynum; Arroyo; Sisca.*

This view of the narcotics business cannot be confined to the context of the *Kotteakos* issue. The government cannot argue that the courts must take a

broad view of the scope of a conspiracy for the purpose of *Kotteakos* and a narrow view of the offense for the purpose of answering the ultimate question in this double jeopardy claim: is the conspiracy below the same offense as that for which appellant was convicted in *Pacelli I*?

The traditional "same offense" test focuses on the evidence adduced. Offenses are the "same" for the purposes of the double jeopardy guarantee when "the evidence required to support a conviction upon one of them [the indictments] would have been sufficient to warrant a conviction upon the other." United States v. Kramer, 289 F.2d 909, 913 (2d Cir. 1961).[7]

This same evidence test is difficult to apply in determining whether one criminal conspiracy is the same as a second criminal conspiracy. The essence of the charge is the criminal agreement to merchandise narcotics. The same agreement may be established by different aggregations of proof. Appellant is hard pressed to show that he could have been convicted under the indictment below on the basis of the evidence introduced in *Pacelli I*, when the overt acts specified in *Pacelli I* were distinct from the overt acts charged below. But because there are no doubt many overt acts which the government might have charged, a test measuring only overt acts provides no protection against carving one larger conspiracy into smaller separate agreements. In part for this reason, courts have been wary of applying a strict same evidence test in the context of criminal conspiracy. In *Short v. United States*, 91 F.2d 614, 624

(4th Cir. 1937), the court rejected reliance on the overt acts alleged, stating:

Blanket charges of "continuing" conspiracy with named defendants and with "other persons to the grand jurors unknown" fulfill a useful purpose in the prosecution of crime, but they must not be used in such a way as to contravene constitutional guaranties. If the government sees fit to send an indictment in this general form charging a continuing conspiracy for a period of time, it must do so with the understanding that upon conviction or acquittal further prosecution of that conspiracy during the period charged is barred, and that this result cannot be avoided by charging the conspiracy to have been formed in another district where overt acts in furtherance of it were committed, or by charging different overt acts as having been committed in furtherance of it, or by charging additional objects or the violation of additional statutes as within its purview, if in fact the second indictment involves substantially the same conspiracy as the first . . . The constitutional provision against double jeopardy is a matter of substance and may not be thus nullified by the mere forms of criminal pleading.

*See also*, United States v. Cohen, 197 F.2d 26 (3d Cir. 1952); Arnold v. United States, 336 F.2d 347 (9th Cir. 1964), cert. denied, 380 U.S. 982, 85 S.Ct. 1348, 14 L.Ed.2d 275 (1965); United States v. Palermo, 410 F.2d 468 (7th Cir. 1969).

Here, the alleged two conspiracies occurred in the same general location at the same general time. One in-

---

7. We recognize that in recent years the "same offense" test has "been subject to serious criticism," *see* United States v. Cioffi, 487 F.2d 492, 496–498 (2d Cir. 1973), with some favoring a looser "policy of fairness" standard which would require the government to try together all offenses arising out of a single transaction or scheme and bar successive prosecutions of such offenses on grounds of double jeopardy, even though the evidence required to support a conviction for one offense might differ in some respects

from that supporting another. *See* Abbate v. United States, 359 U.S. 187, 196, 201, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (separate opinion of Justice Brennan) ; Ashe v. Swenson, 397 U.S. 436, 448, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (concurring opinion of Justice Brennan, joined in by Justices Douglas and Marshall). However, since we conclude that the government in this case has failed to satisfy the stricter traditional test, it becomes unnecessary to decide whether a different standard should be applied here.

volved a large-scale narcotics ring; the known co-conspirators in the other transaction were foot soldiers. We know that a core member of the large-scale operation participated in both transactions, and that the narcotics business is such that it is likely that the foot soldiers were backed up by a larger organization. Moreover, Beverly Jalaba, one of the foot soldiers in *Pacelli I*, was Pacelli's mistress; so close to Pacelli, it is also likely that she was close to his organization.

We think that these facts are sufficient to satisfy appellant's burden of going forward, of putting his double jeopardy rights at issue. At this point, the burden shifts to the government to rebut the presumption, which the facts in this case support, that Papadakos, Possas and Jalaba were part of the Pacelli/Sperling organization.

Besides pointing to the literal differences between the named co-conspirators, the overt acts alleged, and the time frames of the two conspiracies, reliance on each of which is unjustified as shown, the government points to a footnote in *Pacelli I*, United States v. Pacelli, 470 F.2d at 68, n. 2:

> 2. In response to Lepore's question about the source of the heroin, Possas said it came from "Vinnie the Italian." She did not know his last name but said that she had been invited to his wedding and could get his name from the wedding invitation. Possas explained that Vinnie and her boyfriend Papadakos were partners in a heroin distributing ring which supplied customers from Chicago and Detroit. Upon Lepore's request that she call Vinnie, Possas dialed a number registered to Beverly Jalaba, Vinnie's fiancee. She said, "Hello, Vinnie, this is Lisa. My man will take the half," and "Okay, I will see you later." Lepore called Possas at home later that day to get Vinnie's last name. Possas checked the invitation and told Lepore that it was Pacelli.

The government contends that this is probative of the difference between the two conspiracies because there was no proof introduced below that sales of narcotics extended to Chicago and Detroit. However, the government did not attempt either in *Pacelli I* or in the trial below to define the geographical scope of the conspiracies.

■ Thus, the evidence of distinctness to which the government points is not considerable. Unlike the situation in United States v. Aviles, 274 F.2d 179, 193–194 (2d Cir.), cert. denied, 362 U.S. 974, 982, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960), it is not at all clear in this case whether there is any difference between the two conspiracies with respect to such key factors as the "principals, the source of their drugs, the means and places of importation, their distribution points, and the centers from which they operated in Manhattan." 274 F.2d at 194. We conclude, then, that the government has not rebutted the presumption raised by appellant, that the two conspiracies of which he has been convicted are in fact one conspiracy, and we reverse the conviction below on the conspiracy count. Of course, this does not mean that a person once tried for conspiring to violate the narcotics laws can never be tried for another similar offense. In many cases, there may be nothing indicating any connection between the parties or agreements. *See, e. g.,* United States v. Aviles, *supra*; United States v. McCall, 489 F.2d 359 (2d Cir. 1973); United States v. Edwards, 366 F.2d 853 (2d Cir. 1966), cert. denied, 386 U.S. 908, 87 S.Ct. 852, 17 L. Ed.2d 782 (1967); Dryden v. United States, 403 F.2d 1008 (5th Cir. 1968). Of course, the element of time will be of considerable importance in that determination. Intervening factors may also be present; the government may well be able to demonstrate that one conspiracy surely ended before another began. The admissions of the defendant may also be relevant. *See e. g.,* United States v. Pacelli, 470 F.2d 67, 72 (2d Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct.

1501, 36 L.Ed.2d 178 (1973); Reid v. United States, 177 F.2d 743 (5th Cir. 1949). Moreover, where the offense charged is conspiracy to violate federal law other than the narcotics laws, and thus where the offense is likely to be more akin to a "Mom and Pop" business than to a corporate enterprise and so *Kotteakos* retains more vitality, the defendant will bear a higher burden of proving that his double jeopardy right has been abridged. *Reid, supra;* United States v. O'Dell, 462 F.2d 224, 226–227, n. 2 (6th Cir. 1972); United States v. Barzie, 433 F.2d 984 (2d Cir. 1970), cert. denied, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971); United States v. Wilshire Oil Co. of Texas, 427 F.2d 969, 976, n. 12 (10th Cir.), cert. denied, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970). Neither do we suggest that in order to avoid double jeopardy problems of this kind that the government consolidate in one count conspiracy cases which it might have brought separately, for that practice might raise *Kotteakos* problems.

■ If more than one narcotics conspiracy is known to exist, charges may be brought in separate counts. If separate conspiracies become known at different times and are prosecuted separately, prosecutors should be prepared to demonstrate from the proof at the two trials that the criminal agreements are indeed separate and distinct.

In any case, separate indictments on substantive counts are always available, without double jeopardy problems.

In holding that the United States has not established that the conspiracy proved in *Pacelli I* and the conspiracy proved below are not one and the same, we would recall Justice Jackson's warning in Krulewitch v. United States, 336 U.S. 440, 445–446, 69 S.Ct. 716, 719, 93 L.Ed. 790 (1949):

> This case illustrates a present drift in the federal law of conspiracy which warrants some further comment because it is characteristic of the long evolution of that elastic, sprawling

and pervasive offense. Its history exemplifies the "tendency of a principle to expand itself to the limit of its logic." The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself, or in addition thereto, suggests that loose practice as to this offense constitutes a serious threat to fairness in our administration of justice.

But given the broad definition of narcotics conspiracy adopted in our cases, and recognizing that the task of defining the scope of these conspiracies is somewhat akin to describing an elephant from touch, we conclude that appellant has been convicted twice for the same offense.

*Substantive Counts*

■ Pacelli was convicted below of two substantive counts, count two, of distributing heroin to Catino in September, 1971, and count six, of possessing heroin in November, 1971. He claims that his conviction on these counts violates his rights of due process and double jeopardy.

Appellant's first argument is that North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), as extended by United States ex rel. Williams v. McMann, 436 F.2d 103 (2d Cir. 1970), cert. denied, 402 U.S. 914, 91 S. Ct. 1396, 28 L.Ed.2d 656 (1971), bars his prosecution on counts two and six. In *Pearce*, the Court held that one who had won a reversal of a criminal conviction could be sentenced after retrial and conviction to a stiffer sentence than was meted out in the first trial only if the reasons for the imposition of a stiffer sentence affirmatively appeared in the record and were based on objective information concerning the defendant's identifiable conduct after the original sentencing proceeding. In *Williams*, this court recognized that the *Pearce* principle was applicable to enhanced charges as well as to enhanced sentences:

> [T]he sentencing judge is not the only official who may wreak vengeance

upon a defendant for a successful attack on his first conviction. We have no quarrel with the proposition that prosecutorial vindictiveness can be no less an affront to those values we characterize as "due process" than judicial vindictiveness. *Pearce* would have application, if a prosecutor for no valid reason charged a defendant whose first conviction had been set aside, with a more serious offense based upon the same conduct.

436 F.2d at 105. Appellant contends that the prosecutor here has increased the charge against Pacelli by substituting counts two and six, involving heroin, for the substantive counts charged in *Pacelli II* and in *Pacelli III*, which involved only cocaine transactions. He contends that this substitution of heroin charges for cocaine charges was extremely prejudicial and that it was a vindictive reaction to appellant's embarrassing disclosure that the U.S. Attorney's Office had promised Lipsky immunity while purporting not to have done so.

This theory might have some force had the government, for example, added to a previous charge of distributing narcotics in violation of 21 U.S.C. § 841 a charge of distributing that same narcotic to a minor in violation of 21 U.S.C. § 845. That is not the case here. It is one thing to increase a charge from manslaughter to murder, and quite another to charge a defendant, subsequent to a successful appeal, with a second murder. In the words of *Williams,* "*Pearce* would have application, if a prosecutor . . . charged a defendant whose first conviction had been set aside, with a more serious offense *based upon the same conduct.*" 436 F.2d at 105 (emphasis added). Here, the heroin counts are based upon acts which are distinct from charges previously brought against appellant. The government's decision to prosecute appellant for counts two and six is well within the traditionally broad ambit of prosecutorial discretion.

Appellant next contends that the convictions on the substantive counts must be reversed because they violate an agreement he made with the government in *Pacelli III*. After appellant had disclosed the Lipsky promise, appellant and the prosecution agreed to a mistrial in *Pacelli III*. Pacelli claims that part of this agreement consisted of a promise by the government that he would not be retried on new counts based on information available to the government at the time of the agreement. He argues that the information upon which counts two and six are based was then available to the government, that the promise was therefore breached and that the convictions must be reversed because (1) such a promise is specifically enforceable, and (2) his consent to the mistrial in *Pacelli III* is rendered void by the breach, and *Pacelli III* bars prosecution of counts two and six because of double jeopardy.

The promise appellant relies on is nowhere to be found. When defense counsel moved for a mistrial in *Pacelli III*, he spelled out for the court the terms of the agreement between appellant and the government. He stated several times that the agreement had four terms: (a) if *Pacelli II* (then on appeal), were affirmed, *Pacelli III* would be disposed of by *nolle prosequi*; (b) if *Pacelli II* were vacated or reversed, appellant could be retried on those charges along with the substantive charge in *Pacelli III*; (c) if *Pacelli II* were vacated or reversed, and if the government decided not to retry appellant on those charges, then it would also not retry appellant on the *Pacelli III* charges; (d) if appellant were retried on charges from either *Pacelli II* or *III*, and if he were convicted, the government would urge the sentencing court to impose a sentence of not more than 15 years. There is no mention whatsoever in the transcript of charges other than those involved in *Pacelli II* and *III*. The only indication of a promise concerning other charges is appellant's bare allegation, stated in an affidavit, that it was his understanding that he would not

be "retried" on new counts based on information available to the government when the agreement was made.

In the light of the clearly limited agreement revealed in the record, we must reject appellant's argument.

Third, appellant urges that his conviction on the substantive counts should be reversed because the government waited to bring those charges against him for 13 months in the case of count six and for 18 months in the case of count two, during which time the government indicted him several times without confronting him with these charges. He claims that the failure to include these charges in the earlier indictments precludes their use below.

 To the extent that this argument is based on the Sixth Amendment right to a speedy trial or on Rule 48(b), it is foreclosed by United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). To establish a violation of the Fifth Amendment right to due process, appellant must "at least show that [he] suffered actual prejudice in preparing a defense." United States v. Iannelli, 461 F.2d 483, 485 (2d Cir.), cert. denied, 409 U.S. 980, 93 S.Ct. 310, 34 L.Ed.2d 243 (1972). Pacelli claims that the delay in bringing the charges made it impossible for him to counter Lipsky's testimony with alibi witnesses. This claim is too speculative and the evidence against appellant too weighty for us to conclude that the delay deprived appellant of a fair trial. *Iannelli, supra.*

 Nor will we upset these convictions on the ground that this delay constituted prosecutorial harassment. Lipsky's testimony was not available to the government before *Pacelli I;* therefore, appellant cannot complain of the government's failure to include these charges in that indictment. *Pacelli IV* did not involve narcotics violations; joinder of these charges in that case might well have prejudiced appellant. Count six below is the same as count nine against appellant in *Pacelli V,* the *Sperling* trial,

from which appellant was severed. Appellant can legitimately complain, then, only with respect to the failure to charge him with count two in *Pacelli II, III,* and *V,* and with count six in *Pacelli II* and *III.* Although the government has not explained why it chose not to charge Pacelli with these two counts in the earlier trials, we do not believe that where there has been no showing of prejudice this exercise of prosecutorial discretion is the type of action which the *Marion* court had in mind when it suggested that preindictment delay might invalidate a conviction if that delay were designed "to harass" a defendant. 404 U.S. at 325, 92 S.Ct. 455. Pacelli has not been charged with several offenses based on the same acts, and the charges which have been brought appear to have been well founded. Neither has appellant demonstrated that the delay is attributable to any motive other than that which is the *raison d'etre* of the prosecutor: to punish criminal behavior. *Contrast,* Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); United States v. Hanna, 347 F.Supp. 1010 (D.Del.1972). In short, the multiplicity of indictments is more attributable to the multiplicity of appellant's criminal acts than to the bad faith of the government.

 Finally, appellant argues that his conviction on count six below should be reversed because count six is identical to count nine of *Pacelli V,* the *Sperling* trial, and since he was brought to trial on that count once before, his conviction below violated his guarantee against double jeopardy. The record, however, clearly demonstrates that Pacelli requested severance and mistrial in *Sperling* so that he could give exculpatory testimony in favor of his own aunt and uncle, Antoinette and Frank Bassi, co-defendants in the *Sperling* trial, without taking the stand on his own behalf.[8] This request was not necessitated by judicial or prosecutorial impropriety designed to avoid an acquittal, and it

8. Frank was convicted; Antoinette was acquitted.

therefore bars resort to the plea of former jeopardy. United States v. Jorn, 400 U.S. 470, 485 & n. 12, 91 S.Ct. 547, 27 L.Ed.2d 543 (1970); United States v. Goldstein, 479 F.2d 1061, 1067 (2d Cir. 1973). Appellant's attack on this consent to the mistrial, based on allegations concerning Pacelli's understanding or misunderstanding of his counsel, is not supported by the record.

In sum, we affirm each of the convictions below except for the conspiracy conviction of appellant Pacelli, which we reverse for the reasons stated.