**COMMONWEALTH
VS.
Anthony TRAVAGLINI**

**No. 81-170**

Superior Court/Middlesex, ss
Commonwealth of Massachusetts

**July 30, 1982**

Howard Whitehead, 1st Asst. D.A., counsel for plaintiff.

John Bonistalli, counsel for defendant.

## FINDINGS, RULINGS, ORDER AND MEMORANDUM OF DECISION ON THE DEFENDANT TRAVAGLINI'S MOTION TO DISMISS

### Introduction

By the defendant Travaglini's Motion to Dismiss, he seeks to have dismissed on the basis of double jeopardy the Indictment which charges that he conspired with others[1] to distribute cocaine unlawfully in Middlesex County from November 6, 1980 to November 28, 1980. The defendant in effect claims that a Norfolk County Indictment charging him with conspiracy with others[2] to distribute cocaine in the Town of Franklin in Norfolk County on or about December 2, 1980 precludes the Commonwealth from proceeding with the Middlesex County indictment on the grounds of double jeopardy. Put simply, what the defendant claims by his Motion to Dismiss is that he was involved in one conspiracy rather than two conspiracies. The exhibits offered in support of and in opposition to the Motion consist of the Norfolk County indictment which was not accompanied by a bill of particulars, the minutes of the grand jury proceeding which led to the Norfolk County indictment, the indictment in this action, the bill of particulars which accompanies the indictment in this action, the minutes of the grand jury proceeding which led to the indictment in this action and the transcript of the defendant's plea of guilty to the Norfolk County indictment.

### Findings of Fact

After a hearing on the above Motion, from the evidence by way of testimony, exhibits, and inferences therefrom, I find the facts material and relevant to the relief sought by the defendant in his Motion as follows. Trooper Ronald Ford ("Ford") then a Massachusetts State Police Officer for the previous 14 years with much experience in conducting drug investigations and then assigned to the State Police's Special Service Unit, while conducting a gaming and loan sharking investigation in the fall of 1980 commenced court-authorized electronic surveillance of certain telephones in Middlesex County. On October 16, 1980, Ford commenced electronic surveillance of the telephone of a person named Radcliffe. As a consequence of information obtained during the surveillance of telephone calls made and received by Radcliffe, Ford began electronic surveillance of a Sal Sallesa's telephones on November 6, 1980. That surveillance yielded telephone conversations about drug as well as gaming and loan sharking activities and some of the telephone conversations which Ford intercepted included conversations between Sallesa and the defendant who was then living at 449 Maple Street in the Town of Franklin, Massachusetts.

During the telephone conversations between Sallesa and the defendant intercepted by Ford there were some discussions between Sallesa and the defendant about the purchase and sale of cocaine. Ford also learned from his surveillance of these conversations that on one or more occasions Sallesa and the defendant exchanged visits and that a Gilbert Lemaire accompanied Sallesa to the defendant's home in Franklin on some of these visits. On November 23, 1980, Sallesa telephoned one Gilbert Zanni and

---

[1] Salvatore Sallesa, Gilbert LeMaire, Joseph Napoleon, Richard Zanni, Jeffrey Skinden, Charles D. J. Laliberte and Scott Gertsmar.

[2] Robert C. Abney, Diane Desper and William R. Darrah

said "It's here." Before that call was made Sallesa had made several telephone calls to the defendant seeking to acquire cocaine. According to Ford, there seems to have been no transfers of cocaine between Sallesa and the defendant before November 23, 1980.

During the Fall of 1980 the defendant resided at 449 Maple Street in the Town of Franklin, Massachusetts with a female friend and her child. During that period the defendant with his "partner," one Al Ricci, sold cocaine to several friends and acquaintances with whom he "hung around" including a William Darrah and a John Franciose. Sallesa was a friend of and also "hung around" with Ricci, Darrah, Franciose as well as with the defendant during that period.

For some time before November 23, 1980, Sallesa and the defendant had been discussing by telephone and in person the defendant selling some cocaine to Sallesa which the defendant agreed to do. On or about November 22, 1980 the defendant made contact with one Bourque through his partner Ricci. This was the first time the defendant had any dealings with Bourque who brought large quantities of cocaine from Florida to Massachusetts for sale. Bourque, who was from Florida, sold a large quantity of cocaine to the defendant in the evening of November 22, 1980 and the defendant in turn sold four ounces of that cocaine to Sallesa in the morning of November 23, 1980. Apparently Sallesa acquired that cocaine for resale to Zanni and the defendant was not aware that transaction was to take place, that is, that Zanni was the ultimate purchaser of the cocaine acquired by Sallesa. Sallesa had "fronted" or loaned $10,000 to the defendant to assist him in acquiring the large quantity of cocaine he had purchased from Bourque.

On November 23, 1980 in the evening Darrah, LeMaire, Sallesa were visiting with the defendant at his home when the defendant sold four ounces of cocaine to Darrah, two ounces to Sallesa and an undetermined quantity to LeMaire. A few days later the defendant sold another two

or three ounces of cocaine to Sallesa which exhausted the quantity of cocaine the defendant had purchased from Bourque. Sallesa and Darrah then asked the defendant to continue to provide cocaine to them and the defendant contacted Bourque in Florida and it was agreed that Bourque would transport a pound of cocaine to Massachusetts and would sell it to the defendant.

On November 28, 1980, in anticipation that he would be meeting Bourque that evening and obtaining the cocaine from him, the defendant informed Sallesa that additional cocaine would soon be available. On the evening of November 28, 1980 the defendant picked up Bourque at Logan airport in Boston where Bourque had arrived transporting a pound of cocaine. On November 30, 1980 the defendant met with Sallesa and sold four ounces of cocaine to him. The defendant had "cut" the pound of cocaine belonging to Bourque with two ounces of Manatol and there remained fourteen ounces of "cut" cocaine as of November 30 after the defendant's sale of four ounces to Sallesa.

On December 1, 1980 Darrah contacted the defendant at his home and informed him that he had a purchase for the remaining fourteen ounces of cocaine available from Bourque which Darrah apparently knew of. That prospective purchaser was Trooper Bruce Gordon ("Gordon") then a Massachusetts State Police Officer for the previous 11 years with eight years of experience in conducting drug investigations who was then involved in a so-called "undercover" drug investigation. In his undercover capacity Gordon had become acquainted with a Christopher Abney in early November, 1980 and Gordon had expressed an interest in purchasing large amounts of cocaine. At some point Gordon purchased 15 grams of cocaine from Abney for the amount of $1,000.

On December 1, 1980 by prearrangement Gordon purchased an ounce of cocaine from Abney and Abney informed Gordon that his (Abney's)

supplier was "up from Florida" with 10 "units" of cocaine for sale. After discussions Gordon agreed to purchase 1/2 of a kilo of cocaine for the amount of $28,000 from Abney and his supplier. After apparently conferring with either Darrah or the defendant or with both of them Abney informed Gordon that 14 ounces of cocaine was available for the amount of $26,000 and Gordon agreed to purchase the cocaine when he met with Abney later that evening.

Gordon then arranged with a State Police Corporal Anderson of the Norfolk County CPAC Unit to put together a so-called "flash roll" of money. Gordon and a State Police Officer Gregory ("Gregory") then met with Abney and the three of them "stood by" to await word of arrangements to meet with Abney's supplier. Meanwhile, the defendant had obtained the 14 ounces of "cut" cocaine from Bourque and went to 43 Coutu Road where Abney was waiting for him along with an Alfred and Diane Desper. Abney then telephoned Gordon and Gregory, met with them at a location on Route 140 in Franklin, and then returned with them to 43 Coutu Road. When Gordon and Gregory arrived at 43 Coutu Road they entered the premises and verified that the 14 ounces of "cut" cocaine were on the premises and then arrested the defendant and the others there and seized the cocaine. As a consequence of that arrest and seizure of that cocaine, the defendant was indicted in Norfolk County and subsequently pleaded guilty to and was sentenced for that offense. The defendant testified, and I believe his testimony, that he never met Abney before December 1, 1980. The defendant testified and I believe his testimony, that he was not a supplier of cocaine to the alleged co-conspirators named in the indictment in this action other than to Sallesa or to LeMaire.

Middlesex County First Assistant District Attorney Howard Whitehead ("V itehead"), a very competent and experienced district attorney was assigned during the Fall of 1980 to work with Ford on the gaming and loansharking investigation referred-to above. After analyzing the transcripts of telephone conversations intercepted during Ford's surveillance of telephone calls made and received by Sallesa, Whitehead concluded that Sallesa was selling cocaine to those persons and inferred that the defendant and Sallesa were partners or co-conspirators in that venture. As a consequence, Whitehead sought and obtained the indictment in this case without either any knowledge of the events which led to the Norfolk County indictment or with any coordination with Ford.

## Conclusions of Law

The essence of the crime of conspiracy is the agreement to commit a criminal act or to accomplish a lawful act by criminal means. **Commonwealth v. Riseman,** 257 Mass. 254, 256 (1926). Irrespective of whether or not the objective of the conspiracy is to commit one or several crimes, again it is the agreement which constitutes the conspiracy which is punishable. **Braverman v. U.S.,** 317 U.S. 49, 53 (1942). The term "Agreement" in the context of a criminal conspiracy is used in a broad sense to encompass an entire combination or plan. "Because a conspiracy may have many illegal objectives, it will necessarily involve a number of sub-agreements to commit each of these specified objectives . . . If each stitch in that web were to be treated as a separate conspiracy, infinite bases for liability could be confected . . ." **Commonwealth v. Winter,** Mass. App., 402 N.E. 2d 1372, 1379 (1980).

Applying those principles to the defendant's double jeopardy claim, one large narcotics conspiracy may consist of subsidiary agreements corresponding to the division of labor among co-conspirators in the scheme of narcotics distribution. A breakdown of an overall conspiracy into subtasks necessary to the accomplishment of the plan is consistent with the existence of a single conspiracy. Further, it is not legally necessary that all of the conspirators join in every part of an

unlawful transaction, **Commonwealth v. Beal,** 314 Mass. 210, 223 (1943). Some members of a conspiracy may never meet other of these co-conspirators as in the so-called "hub" conspiracy in which several individuals deal solely with the "core" conspirator.

For the purpose of determining whether a defendant has been subjected to double jeopardy, the test is usually whether the same set of facts which would support a conviction in one indictment would be sufficient to support a conviction in another indictment. **Commonwealth v. Beneficial Finance,** 360 Mass. 188, 224-226 (1971). This traditional "same offense" test, which focuses on the evidence to be used, is of less utility in conspiracy cases than for other offenses. The major reason why it is difficult to apply the "same offense" test to conspiracy prosecutions is the nature of evidence used to prove conspiracy. "While a conspiracy may be proved either by direct or circumstantial evidence, it is not often that direct evidence tending to prove the crime may be adduced, but resort must be had to circumstantial evidence, and this is the usual way of proving it." **Commonwealth v. Riches,** 219 Mass. 430, 438 (1914). Circumstantial evidence is the usual and accepted method of proving conspiracy. **Commonwealth v. Benesch,** 290 Mass. 125, 132-133 (1935); **Commonwealth v. Staslun,** 349 Mass. 38, 49-52 (1965).

"This same offense test is difficult to apply in determining whether one criminal conspiracy is the same as the second conspiracy . . . The same agreement may be established by different aggregations of proof . . . A test measuring only overt acts provides no protection against carving one larger conspiracy into small separate agreements. In part for this reason, courts have been wary of applying a strict same evidence test in the context of criminal conspiracy." **United States v. Mallah,** 503 F.2d 971, 985 (1974). **Mallah, supra,** suggests that the same evidence test should be modified when a criminal conspiracy arises double jeopardy questions. Pursuant to **Mallah** a defendant bears the burden of going forward and putting his double jeopardy rights at issue at which point the burden shifts to the government to rebut the presumption of evidence of a single conspiracy.

The defendant in this action has met his burden of going forward on his claim that he was involved in a single conspiracy. Both the Middlesex and the Norfolk "conspiracies" occurred at substantially the same time. The Norfolk indictment charges the defendant and the others with conspiracy to distribute cocaine on or about December 2, 1980. The Middlesex indictment charges the defendant with conspiracy to distribute cocaine between November 6, 1980 and November 28, 1980. Looking beyond the face of the two indictments, as is permissible when two indictments are sufficiently dissimilar on their face with respect to dates and persons named to raise a question of fact as to whether the conspiracies charged in the two indictments are the same, **Commonwealth v. Beneficial Finance,** 360 Mass. 188, 225 (1971) it is clear that the Norfolk "conspiracy" did not spring into existence in one day. As the Grand Jury proceedings indicate, the Norfolk transaction involved extensive preparation and communication between co-conspirators prior to December 2, 1980. Gordon testified to the Norfolk Grand Jury that he purchased cocaine from Abney, one of defendant's co-conspirators, on November 7, 1980. Under this analysis, the dates of the Norfolk and Middlesex conspiracies are nearly congruent.

Sargent Primeau's testimony before the Middlesex Grand Jury indicates that surveillance of the defendant's home in Franklin was undertaken and that defendant's telephone conversations with Sallesa were intercepted as evidence of the Middlesex conspiracy. It is consistent with the theory of a single chain conspiracy for the defendant to have played a central role in dealing with one set of distributors working a specific territory in Middlesex Count and another set of distributors

covering the Franklin area.

Another indication that the Norfolk and Middlesex "conspiracies" amounted to one conspiracy is First Assistant District Attorney Whitehead's reliance on the November 25, 1980 sale of cocaine in Norfolk as evidence in the Middlesex case. I am not persuaded by the Commonwealth's argument (Memorandum of the Commonwealth in Opposition to Motion to Dismiss, p. 6) that evidence of the Norfolk sale will be limited to proving a common scheme, i.e., "that defendant on other occasions has been present at, and to some degree participated in, the sale of cocaine." Given the overlapping time frame of the two indictments, the government's reliance on the Norfolk sale to prove the Massachusetts conspiracy defeats its own contention as to the existence of two independent narcotics combinations.

Based on the evidence offered in support of the motion to dismiss, it appears that defendant was a key conspirator in a larger plan to purchase and to distribute cocaine in both Middlesex and Norfolk counties. The findings of fact made above reveal that Bourque was the supplier of cocaine which Travaglini sold to Sallesa, a conspirator named in the Middlesex indictment. On November 23, 1980, defendant Travaglini sold cocaine in a single transaction to Darrah and LeMaire, named co-conspirators in the Norfolk and Middlesex indictments, respectively. Cocaine from one supplier was sold by the defendant on the same date and at the same location to members of the purported separate conspiracies.

In sum, as found in "where two or more chains are connected to a hub by core conspiratories this court has not hesitated to view the entirety as a single conspiracy." **Mallah, supra,** at 984.

ORDER

For the foregoing reasons, the defendant's motion to dismiss is ordered allc ed.

**Paul G. Garrity**
**Justice of the Superior Court**