**UNITED STATES of America,**
**Plaintiff,**

v.

**Cornelius SINGLETON, Defendant.**

**No. CRIM. 00–0105(PLF).**

United States District Court,
District of Columbia.

Dec. 4, 2001.

John Dominguez, Assistant U.S. Attorney, Washington, DC, for Government.

James Lyons, Kellogg Williams & Lyons, Washington, DC, for Defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court on the motion of defendant Cornelius Singleton to dismiss Count One of the indictment on grounds of double jeopardy and on his separate motion to dismiss Counts One and Two on grounds of double jeopardy. The government filed oppositions to the motions, and the Court heard oral argument on August 31, 2001 and September 24, 2001.

## I.  BACKGROUND

Cornelius Singleton was indicted by a grand jury in the United States District Court for the Southern District of Florida on March 16, 2000. *See* Exhibit 2 to Defendant's Memorandum in Support of Motion to Dismiss Count One of the Indictment on Grounds of Double Jeopardy ("Def.Mot.Exh. 2"). He was charged with knowingly and intentionally combining, conspiring, confederating and agreeing with six other named defendants and "with others known and unknown to the Grand Jury" to possess with the intent to distribute a Schedule II controlled substance, a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846. Def. Mot. Exh. 2. The conspiracy allegedly ran from on or about January 1, 1996 to February 26, 2000 in Miami, Miami–Dade County, in the Southern District of Florida, "and elsewhere." *Id.* In addition to the conspiracy count, the indictment contained two substantive counts charging a number of the defendants with possession with intent to distribute cocaine, but defendant Singleton was charged in neither of these counts. *See id.* at 2–3.

Superseding indictments were returned in Florida on April 6, 2000, August 31, 2000, and September 21, 2000. *See* Def. Mot. Exhs. 3–5. In each of the superseding indictments, defendant Singleton was charged with the same conspiracy covering the same time period, and his co-defendants remained largely the same. The forfeiture provision changed from indictment to indictment, and the conspiracy count was modified in the final iteration to take account of the Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Def. Mot. Exh. 5 at 2. Singleton was never charged in any of the substantive counts.

On March 16, 2000, a grand jury in the United States District Court for the District of Columbia returned a one-count indictment charging defendant Singleton and four other individuals—Phyllis Marie Webster, Michael Anthony Johnson, Byron Lamont McDade and Benjamin Gilbert Ashe—"and other persons known and unknown to the grand jury" with unlawfully, knowingly and willfully combining, conspiring, confederating and agreeing to distribute and possess with the intent to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in the amount of

five kilograms or more, in violation of Title 21, United States Code, Sections 841(a) and (b)(1)(A)(ii), all in violation of Title 21, United States Code, Section 846. Def. Mot. Exh. 16. The conspiracy allegedly began on or about January 1, 1993 and continued to on or about March 16, 2000; it allegedly took place in the District of Columbia, the Eastern District of Virginia, the District of Maryland, the Southern District of Florida and elsewhere.[1] None of the Florida defendants except Singleton was named in this indictment.

A superseding indictment, adding Lionel Nunn as a defendant, was returned on April 20, 2000; the start date of the conspiracy was changed to January 1, 1994. *See* Def. Mot. Exh. 17. Another superseding indictment, adding Lauren Jefferson (defendant Nunn's wife) as a defendant and adding an additional count, charging her and Nunn (but not defendant Singleton) with money laundering, was returned on March 29, 2001. *See* Def. Mot. Exh. 18. Yet another superseding indictment, this one adding a count charging defendant Singleton with engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Sections 848(a) and (b), was returned on August 9, 2001. This indictment names only Cornelius Singleton and Byron McDade as defendants. Former co-defendants Webster, Johnson, Ashe and Nunn—all of whom have entered guilty pleas—are now named as unindicted co-conspirators, as are "other persons known and unknown to the grand jury."

Count Two of the August 9, 2001 superseding indictment charges defendant Singleton with "unlawfully, knowingly and intentionally engag[ing] in a continuing criminal enterprise" from January 1991 until March 16, 2000, by violating Title 21, United States Code, Sections 841(a)(1), 843 and 846, all in violation of Title 21, United States Code, Sections 848(a) and (b). According to the indictment, the predicate violations include (1) the conspiracy charged in Count One; (2) many of the Overt Acts (specifically, Overt Acts 1, 3, 4, 5, 6, 7 and 8) listed in Count One; and (3) various other narcotics conspiracies in the District of Columbia, Tennessee, Georgia, Maryland and New York, all of which are said to be a part of the charged continuing criminal enterprise. All but one of these conspiracies are within the same time frame as Count One of the District of Columbia indictment.

On October 25, 2000, defendant Singleton was convicted by a jury in the Southern District of Florida of conspiring to possess five kilograms or more of cocaine with the intent to distribute it. The evidence at trial showed that during the period from January 1, 1996 to February 26, 2000, defendant Singleton obtained multi-kilogram quantities of cocaine from suppliers in Florida—specifically, from his co-defendant Giraldo Orlando Fernandez and one Marcelino Casasnovas, who testified for the government at Singleton's trial— and then shipped the cocaine through a courier, Ronald Lucas, to Washington, D.C. for distribution by Phyllis Webster and Michael Johnson.[2] Following his conviction, defendant Singleton was sentenced to 285 months in prison.

Defendant Singleton argues that Count One of the indictment now pending in this Court and the conspiracy count of the indictment on which he was convicted in Florida charge the same conspiracy. Be-

---

1. Later versions of the indictment referred to the District of Columbia, the Commonwealth of Virginia, the State of Maryland, the State of Florida "and elsewhere."

2. Mr. Lucas is the defendant in Criminal No. 00–0137 in this District, which has been assigned to the undersigned as a case related to the instant case.

cause Mr. Singleton has already been convicted and sentenced for his illegal conspiratorial conduct in Florida, he argues that he cannot be prosecuted again here without running afoul of the Double Jeopardy Clause of the United States Constitution. With respect to Count Two, the continuing criminal enterprise or CCE charge, defendant argues that the CCE agreement is in reality the "same offense" as the Florida/D.C. narcotics conspiracy, or that the conspiracy is a lesser included offense of the CCE charge and that the Double Jeopardy Clause prohibits prosecution for greater and lesser included offenses in successive prosecutions.

## II. THE FACTS

Through a series of Title III wire intercepts on the telephones of Phyllis Webster and Michael Johnson in the District of Columbia—two of defendant Singleton's original codefendants in this case—law enforcement agents learned that Singleton was supplying kilogram shipments of cocaine from Miami, Florida to Webster and Johnson in the District of Columbia, by use of a courier, Ronald Lucas. *See* Def. Mot. Exh. 3 at 20–22. On this basis, the FBI in Florida obtained authorization under Title III to intercept conversations on defendant Singleton's telephone in Miami, which revealed that Singleton's cocaine source was Fernandez with whom Singleton subsequently was indicted. *See* Def. Mot. Exh. 21. By the time of the trial in Florida, only three defendants remained— defendant Singleton, Giraldo Orlando Fernandez and Hugo Orga.[3] The trial in Florida lasted four days. Among the witnesses at trial were FBI Special Agent Kevin Ashby (the lead FBI agent in this case), Michael Anthony Johnson, Ronald Lucas, and Phyllis Webster.

In his opening statement, the prosecutor told the jury:

[I]n Count One the government expects our evidence to show that, during the period of 1996 to 2000—not always, not everyone was in the conspiracy at the same time for the full period of time—*Cornelius Singleton was shipping multi-kilograms of cocaine*—a kilogram is 2.2 pounds—*to the District of Columbia from Florida for distribution in the District of Columbia and other areas.* This continued through 1999.

*You will have the opportunity, we expect, to hear from the distributors from the District of Columbia who have been arrested and charged in that district, Phyllis Maria Webster and Michael Anthony Johnson.*

You will also hear from the courier who has been arrested and charged, *Ronald Lucas, who distributed the cocaine in the sense that he took it form Miami from Cornelius Singleton and transported it to the District of Columbia and gave it to these other people.*

You will further hear from one of the defendant Singleton's local suppliers Marcelino Casasnovas, who is in custody, who supplied him with large quantities of cocaine.

Finally, as to the conspiracy, you will hear from a supplier who will testify that Giraldo Orlando Fernandez, one of the co-defendants here, was also one of Cornelius Singleton's suppliers.

A part of the evidence will involve, as you have heard, wiretaps. *In 1999, the Washington Field Office of the FBI conducted a court authorized wiretap of Phyllis Maria Webster, who is one of the D.C. distributors.* It was of her cell phone in the D.C. area. *You will hear two calls from this interception regard-*

---

**3.** The other three defendants had either pleaded guilty or were dismissed.

*ing shipments between Singleton and Webster.*

Soon after this wiretap, the FBI in Miami conducted a court-authorized wiretap on the defendant Singleton's cell phone. You will hear several calls from this interception regarding orders for cocaine placed with the defendant Singleton.

\* \* \* \* \* \*

The evidence will, of course involve transcripts. You will hear recordings and see transcripts of the recorded conversations that were intercepted that we feel are relevant to these charges.

\* \* \* \* \* \*

*And you will finally hear from the cooperating individuals who have been charged in various jurisdictions as part of this conspiracy* who will testify for the government.

Def. Mot. Exh. 6 at 19–23 (emphasis added).

At Singleton's trial in Florida, Phyllis Webster testified that she purchased 25 kilograms of cocaine from defendant Singleton for distribution in Washington, D.C. in June of 1996. Singleton shipped the drugs from Florida to the District of Columbia using Ronald Lucas as the courier. Webster testified that she had two or three additional drug deals with Singleton in 1996, each involving between 25 and 30 kilograms of cocaine. In each case Lucas would bring the cocaine from Florida, deliver it to Webster in Washington on consignment, and then pick up money from her* and deliver it to Singleton in Florida. There were three or four similar transactions in 1997, each involving 50 to 60 kilograms of cocaine, and three or four in 1998, in the 50–kilogram range. Webster then testified about three quite specific cocaine transactions with Singleton in 1999: 60 kilograms in April, 80 kilograms

on Memorial Day, and 60 kilograms on the 4th of July. Finally, Webster testified about visiting Singleton at his home in Florida in November 1999, at which time she helped him count money, and about certain telephone conversations with Singleton in which they discussed drug prices and drug amounts. *See* Def. Mot. Exh. 9 at 14–17; Def. Mot. Exh. 10 at 16–21.

Michael Johnson testified at the Florida trial that he also did several multi-kilogram drug deals with Singleton from 1996 to 1998 and that Lucas was always the courier. He said there were at least six such deliveries in 1996, each involving around 50 kilograms of cocaine, and similar transactions in 1997 and 1998. *See* Def. Mot. Exh. 9 at 66–69.

Ronald Lucas testified that he transported multi-kilogram shipments of cocaine in his van from Florida to Washington, D.C. and delivered the drugs to Webster and Johnson on consignment. After Webster and Johnson distributed the drugs, Lucas said he would pick up money from Webster and Johnson in Washington and deliver the money to Singleton in Florida. Most of the shipments were in the 50–kilogram range. Lucas testified that on at least six occasions in 1997 and 1998 Giraldo Orlando Fernandez brought multi-kilograms of cocaine to Singleton's home in Florida and loaded the drugs in Lucas' van for delivery to Webster and Johnson in Washington, D.C. *See* Def. Mot. Exh. 9 at 111–18.

At the conclusion of the evidence, the prosecutor made the following argument to the jury:

Now you heard from [Ronald] Lucas who was a courier for Singleton, and he testified that he knew Fernandez as "O". And that Fernandez would drop off 50 kilos at a time to Cornelius Singleton's condo on Shipping Avenue in Coconut Grove, which Lucas would then take to

D.C. for distribution on behalf of Cornelius Singleton.

*You heard from two of the distributors of Cornelius Singleton, and that would be Johnson and Webster.*

Johnson has known Cornelius Singleton since 1991, and it was clear from the call you heard that *they knew each other well enough to discuss amounts of money which Webster owed for cocaine* and to know why Singleton would not ship cocaine during the Thanksgiving season.

*Johnson testified that he dealt with Cornelius between 1996 and '98 in 50–kilogram shipments for each transaction.* He would discuss the prices directly with Cornelius Singleton.

You also heard from Phyllis Webster. She was also somebody that Cornelius Singleton supplied. It would be one level down. And Webster would then distribute, on her own, in Washington, D.C.

She testified that she received also multi-kilogram quantities from Singleton. The [intercepted telephone] calls discuss multi-kilogram transaction[s] in which quantity and prices are discussed.

It is especially telling that the *numbers called out by Phyllis Webster to Singleton in the calls represented the kilograms which Webster received from Cornelius Singleton.*

\* \* \* \* \* \*

Let me show you how this works. I am going to refer you to what was introduced as Government's Exhibit 12 [Def. Mot. Exh. 11]. *This was the drug ledger that was found in the master bedroom of Cornelius Singleton.*

\* \* \* \* \* \*

She goes on. On page 3, about a quarter of the way down where Webster says: "I already know the last two times you charged me. The very last two times you charged me 2150, and the first

time before that I think you charged me 2250 because it went down a dollar."

And here are the corresponding amounts. You have the last two times at 2150 and the first time before that was 22.5.

Then in the next call, the last call that we played for you today, at tab 35, at the first page, Webster says: "Hey, do you want me to—do you want me to give you a count?"

Cornelius Singleton says: "Do you got [what] I want to hear now?"

Phyllis: "He told me."

Cornelius: "Well, let me get my paper back. Hold on."

Now this, on Exhibit 12 [Def. Mot. Exh. 11] that was the ledger that was found in the Cornelius [Singleton's] master bedroom, is the back of this page. So he's telling Phyllis, "Hold on, let me get that paper."

The next page says: "Hold on. I'm walking down."

Phyllis: "I'm walking down my ramp. My customers are walking past me. I'm walking outside, okay. *It was, and here are the numbers, 60, 80, 60.*"

And here are the numbers.

Then it continues.

Cornelius: "60, 80, 60."

Okay, what was the figure? 60.

*Then they give the prices. Webster says 22 and a half and then 80 and the 60 were at 21 and a half.*

And here are the corresponding prices.

What's also interesting is that Lucas testified, you recall, that Orlando Fernandez would drop off the kilograms sometimes at the Shipping Avenue condo for him to take up to D.C. Phyllis was in D.C. *And if you see this ledger, here is the "O" with amounts that would*

*represent the kilograms that were forwarded up to D.C.*

*There was a conspiracy. You have the government showing Fernandez distributing.* You have [co-defendant] Orga playing three different roles: He stores for Fernandez in his house, the kilograms. He distributes. As you heard he got one at least form Prado; and he is a courier. He also, when he is needed, will transport and deliver cocaine. *You have hand-delivering to Cornelius Singleton, who then, in turn, distributes to other people.*

The government submits that it has proved beyond a reasonable doubt all the elements and all the charges and we request that you return a verdict of guilty on all three counts against all three defendants.

Def. Mot. Exh. 10 at 95–99 (emphasis added). The Florida jury convicted defendant Singleton of conspiracy to possess with intent to distribute five kilograms or more of cocaine between January 1, 1996 and February 26, 2000.

As in every narcotics case, an important issue at sentencing was how much cocaine should be attributed to defendant Singleton. The probation officer concluded that the proper offense level was Level 38 because Singleton was responsible for more than 150 kilograms of powder cocaine. At sentencing the government argued that the evidence showed that defendant Singleton sent well over 150 kilograms of cocaine to the District of Columbia for distribution by Webster and Johnson. It relied on Ronald Lucas' trial testimony that he had picked up "well in excess of 150 kilograms of cocaine from Singleton" in Miami for transportation to the District of Columbia, on Phyllis Webster's testimony that Singleton "supplied well in excess of 150 kilograms of cocaine to her during the period of the conspiracy," and on Mi-

chael Johnson's testimony that he received "over 150 kilograms of cocaine from Singleton during the period of the conspiracy." Def. Mot. Exh. 15 at 19–20. The government . argued to the sentencing judge:

There was also testimony of two of Singleton's distributors, one was Johnson and the other was Webster, Phyllis Webster.

Johnson testified he knew Singleton since 1991. Johnson testified that between 1996 and 1998 he dealt with Singleton in 50–kilogram shipments. Webster also testified that she received multi-kilogram quantities from Singleton.

Webster was heard in an intercepted call saying "[t]he last one was 60 and the one before was 78."

Singleton was heard stating: "60, 80, 60." And Webster gave the corresponding prices to be 22–and–a–half, and the two other batches at 21–and–a–half.

\*　　\*　　\*　　\*　　\*　　\*

The quantity and the prices were memorialized on a piece of paper that was seized at Singleton's residence. The same ledger also showed the quantities that "O", referring to Orlando Fernandez, per Lucas's testimony, would drop off at the Shipping Avenue address in Coconut Grove so that Lucas would then take that to D.C. for distribution.

So, if you take the testimony from all these different individuals, all these different instances, transactions, there is more than 150 [kilograms].

*Id.* at 25–26.

In urging the court to sentence Singleton at the high end of the guideline range, the government argued that great harm was done by defendant Singleton and the other conspirators to the citizens of the District of Columbia:

*These hundreds of kilos of cocaine went to the District of Columbia area—Maryland, Virginia, the District of Columbia, and I would argue to the Court that this was distributed on the streets of those jurisdictions.*

*That cocaine, we know it was distributed. And, therefore, we know it was consumed by citizens of those jurisdictions.* The horrors of this distribution cannot be over-emphasized.

Because we know the full story of this case, because we know the implications of this distribution, we strongly recommend that Mr. Singleton be given the very stiffest sentence incarceration the Court may give, and that is the top of the guidelines in this instance.

Def. Mot. Exh. 15 at 35–36 (emphasis added). Based on his recollection of the testimony during the trial, the trial judge made an express finding that "the evidence is more than ample to show that there was in excess of 150 kilograms of cocaine involved" and that "these transactions [were] part of the conspiracy." Det. Mot. Exh. 15 at 26. He sentenced the defendant to 285 months' imprisonment. *See id.* at 43–44.

Among the primary witnesses at the trial of defendant Singleton and his co-defendant in this Court will be Phyllis Webster, Michael Johnson and Ronald Lucas, as well as Marcelino Cassasnovas, all of whom also testified in Florida. *See* Def. Mot. Exh. 19, Government's Memorandum in Support of Motion for Pretrial Ruling on the Admissibility of Co–Conspirators' Statements at 2–3. According to the government, Webster will testify that she received approximately 775 kilograms of cocaine from Singleton during the course of the conspiracy, Johnson will testify that he received about 900 kilograms, and Lucas will testify that he transported over 1,300 kilograms of cocaine from Singleton in Florida to Webster and Johnson in the

District of Columbia. *See id.* at 2. Furthermore, intercepted conversations with Webster, Singleton and McDade will be offered to "confirm that Singleton shipped 200 kilograms of cocaine to Webster via Ronald B. Lucas. . . . In particular for example, the conversations of September 28, 2000 specified the dates the shipments were received (April, Memorial Day, and July 4, 1999), the quantities, that is, 60, 80, and 60 kilos, the exact price per kilo. . . ." *Id.* at 4.

## III.  DISCUSSION

### A.  The Florida and District of Columbia Conspiracy Charges

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution guarantees that no person "shall be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend.  V. It protects a criminal defendant against reprosecution for the same offense after an acquittal, against prosecution for the same offense after conviction, and against multiple punishments for the same offense. *See North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). Traditionally, to determine whether one is being prosecuted twice for the "same offense" as opposed to two separate offenses, the courts have examined and compared the elements of the statutory provisions at issue and the evidence necessary to support a conviction on each. *See Blockburger v. U.S.*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Every court of appeals that has examined the issue in the context of a conspiracy case, however, has concluded that a strict application of this "same evidence" test is unworkable.

The Fourth Circuit has explained:

In most instances, the "same evidence" test, pragmatically applied, provides adequate protection against successive prosecutions. In conspiracy cases, however, the peculiar characteristics of the offense itself present special problems that require application of an even more flexible test. The gist of the crime of conspiracy is the agreement to commit unlawful acts. But the same conspiracy may be established by different aggregations of proof, for a single agreement may continue for an extended period of time and involve the commission of numerous criminal acts. Strict application of the "same evidence" test to successive conspiracy charges would therefore permit the government to subject an accused to repeated prosecutions for what is in reality the same criminal conspiracy, simply by selecting a different set of overt acts for each indictment. For this reason, this circuit, along with most others, has adopted a multi-pronged "totality of the circumstances" test to determine whether two successive conspiracy counts charge the "same offense" within the meaning of the double jeopardy clause.

*United States v. Ragins,* 840 F.2d 1184, 1188 (4th Cir.1988) (citations omitted); *see also United States v. Jarvis,* 7 F.3d 404, 410–11 (4th Cir.1993). As the Second Circuit put it, in the conspiracy context "a test measuring only overt acts provides no protection against carving one larger conspiracy into smaller separate agreements." *United States v. Mallah,* 503 F.2d 971, 985 (2d Cir.1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

Under the "totality of the circumstances" test adopted by the Fourth Circuit and virtually every other circuit to have considered the matter,[4] the courts have looked to at least five factors or guidelines to assess the validity of a double jeopardy claim made with respect to successive conspiracy prosecutions: (1) the time periods covered by the alleged conspiracies; (2) the geographic areas in which the conspiracies are alleged to have occurred; (3) the persons considered as co-conspirators in each case; (4) the overt acts alleged to have been committed in furtherance of the conspiracies, or other descriptions of the offenses charged that indicate the nature and scope of the activities being prosecuted; and (5) the substantive statutes alleged to have been violated. *See, e.g., United States v. Jarvis,* 7 F.3d at 411; *United States v. Okolie,* 3 F.3d 287, 290 (8th Cir.1993); *United States v. Benton,* 852 F.2d 1456, 1462 (6th Cir.1988).[5] By examining these factors, the Court can determine whether there was one agreement or more than one, and hence one conspiracy or separate conspiracies.

In advancing a double jeopardy claim, the defendant has the initial burden to show that he has a *prima facie* nonfrivolous claim. *See United States v. Harvey,* 78 F.3d 501, 505 (11th Cir.1996); *United States v. Benefield,* 874 F.2d 1503, 1505–06 (11th Cir.1989); *United States v. Liotard,* 817 F.2d 1074, 1077 (3d Cir.1987); *United States v. Adamo,* 742 F.2d 927, 946–47 (6th Cir.1984); *United States v. Mallah,* 503 F.2d at 986. Once the defendant has made this showing, the burden then shifts to the

4. *See* Defendant's Memorandum in Support of Motion to Dismiss Count 1 of the Indictment on Grounds of Double Jeopardy at 34–35 nn. 38 & 39.

5. The Second Circuit, in addition to the five factors identified above, also considers three

other factors: similarity of operations, common objectives, and the degree of interdependence between the alleged distinct conspiracies. *See United States v. Calderone,* 982 F.2d 42, 45 (2d Cir.1992); *United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985).

government to "prove by a preponderance of the evidence that the two indictments charge separate crimes," *United States v. Benefield*, 874 F.2d at 1505, or that "the separate conspiracies charged are *not* the same conspiracy." *United States v. Harvey*, 78 F.3d at 505. With respect to Count One, the government concedes that defendant Singleton has raised a nonfrivolous claim, and it therefore bears the burden of showing that the conspiracy charged in Count One is a separate crime from the Florida conspiracy. Despite the slight differences in the list of defendants and named conspirators and the dates of the conspiracies, under the totality of the circumstances test this Court must conclude that the Florida and the District of Columbia prosecutions for narcotics conspiracy against defendant Singleton are for "the same offense" under the Double Jeopardy Clause. Count One of the indictment therefore must be dismissed.

### 1. *Time Periods*

The conspiracy charged in the Florida indictment allegedly ran from on or about January 1, 1996 to February 26, 2000, and the conspiracy charged in the District of Columbia indictment allegedly began on or about January 1, 1994 and continued to on or about March 16, 2000. While the conspiracy charged here therefore allegedly began two years earlier than the one charged in Florida and ended a few days later, the entirety of the alleged Florida conspiracy is contained within the time frame of the District of Columbia conspiracy. Furthermore, the evidence admitted at the trial in Florida demonstrated that even during the two uncharged years, from January 1994 to January 1996, defendant Singleton provided cocaine to Ronald Lucas who transported it to Michael Johnson in the District of Columbia, suggesting that the Florida prosecutors could easily have asked the grand jury there to have

charged a conspiracy that began simultaneously with the District of Columbia conspiracy. This is not a case where "the government may well be able to demonstrate that one conspiracy surely ended before another began." *United States v. Mallah*, 503 F.2d at 986. As the government concedes, the time overlap strongly suggests that the two prosecutions are for the same conspiracy offense for purposes of double jeopardy analysis.

### 2. *Geographic Areas*

The Florida indictment alleges that the conspiracy took place in "Miami–Dade County, in the Southern District of Florida," and "elsewhere." Def. Mot. Exh. 5. The District of Columbia indictment alleges that the conspiracy took place not only in the District of Columbia but also in the Commonwealth of Virginia, the State of Maryland, "the State of Florida and elsewhere." Thus, the District of Columbia indictment by its terms does not confine the conspiracy only to the District of Columbia and its environs; indeed, it expressly mentions Florida. Furthermore, the evidence offered by the government at the Florida trial showed that a part of the conspiracy was the travel of Ronald Lucas on numerous occasions from Florida to Washington, D.C., the deliveries of cocaine by Lucas to Webster and Johnson in the District of Columbia, and the return of Lucas from Washington, D.C. to Florida with money for the drugs. The evidence at the Florida trial also showed that defendant Singleton himself traveled from Florida to Washington, D.C. on at least one occasion to meet with Phyllis Webster in furtherance of the conspiracy, *see* Def. Mot. Exh. 9 at 16–17, and that both Webster and Johnson traveled to Miami to meet with Singleton. *See id.* at 69–70; Def. Mot. Exh. 10 at 19.

The government has made plain that it intends to introduce evidence at defendant Singleton's trial in the District of Columbia of Singleton having provided cocaine to Ronald Lucas in Florida for delivery in the District of Columbia, *see* Def. Mot. Exh. 19 at 2–4, and that it intends to do so not as "other crimes" evidence under Rule 404(b) of the Federal Rules of Evidence but as an intrinsic part of the charged conspiracy itself. *See* Government's Notice of Intent to Admit Rule 404(b) Evidence at 3–4, 7–8. The overlap of the geographic locales of the two charged conspiracies demonstrates that these are one and the same conspiracy, not two separate conspiracies.

### 3. *Participants/Co-conspirators*

■ As the government argues, defendant Singleton is the only person named as a defendant in both the Florida and the District of Columbia indictments. Both indictments, however, charge that the named defendants conspired with "other persons known and unknown to the grand jury." The Court therefore may consider those unnamed conspirators to the extent it has become apparent who they are and the relationship between and among them in connection with the two charged conspiracies. *See United States v. Jarvis*, 7 F.3d at 411, *United States v. Benefield*, 874 F.2d at 1507.

A review of the transcript of the Florida trial shows that even though they were not named in the indictment in Florida, Phyllis Webster, Michael Johnson and Ronald Lucas were co-conspirators of defendant Singleton in connection with the conspiracy with which he was charged and convicted in Florida. They were all witnesses in Florida, and there was much testimony that Singleton provided drugs to Lucas in Florida to deliver to Johnson and Webster in the District of Columbia, who in turn gave Lucas money to pay to Singleton in Florida.[6] The evidence introduced in the Florida trial—including but not limited to the testimony of Webster, Johnson and Lucas—demonstrated that the roles of Singleton, Lucas, Webster and Johnson, among others, were the same in both the conspiracy charged in Florida and the conspiracy charged here: Singleton obtained the cocaine from Fernandez in Florida, provided it to Lucas in Florida who loaded his van (sometimes with Fernandez's help) and drove it to the District of Columbia, where he delivered the cocaine to Webster and Johnson, who sold the cocaine in the District of Columbia and then gave money to Lucas who took the money back to Florida and gave it to Singleton. The government in its closing argument in Florida made clear that the government viewed the activities in Florida and the activities in the District of Columbia as part of the same conspiracy. *See supra* at 8–11; Def. Mot. Exh. 10 at 95–99. Fairly evaluated, the overlap of core members in the Florida and the District of Columbia conspiracies—Singleton, Lucas, Webster and Johnson—strongly suggests that both indictments charged the same offense for double jeopardy purposes. *See United States v. Liotard*, 817 F.2d at 1079; *United States v. Mallah*, 503 F.2d at 986.

### 4. *Overt Acts*

■ Unlike the conspiracy counts of each of the indictments filed in this case, the indictments in Florida alleged no overt acts and did not set out the "manner and means to accomplish the conspiracy."[7]

---

6. Webster and Johnson were named in the original indictment against defendant Singleton in the District of Columbia, and Lucas was indicted in a related case.

7. Unlike most other conspiracy statutes, the federal Controlled Substances Act conspiracy provision, 21 U.S.C. § 846, does not require the government to list in the indictment any overt acts taken in furtherance of the conspir-

Because the trial in Florida has already taken place, however, the Court is able to review the evidence introduced by the government in Florida and compare it with both the overt acts and the manner and means alleged in the District of Columbia indictment and with the evidence proffered by the government in pretrial proceedings in this case. *See United States v. Collazo–Aponte,* 216 F.3d 163, 198 (1st Cir.2000).

The indictment in the District of Columbia alleges 14 overt acts. Among them are the following:

1. On or about September 11, 1995, within the State of Florida, a courier imported between 1200 and 1700 kilograms of cocaine to a home in Islamorada, Florida, and said cocaine was destined in whole or in part to Cornelius Singleton, also known as Chico, also known as Neal.

\* \* \* \* \* \*

3. On or about April 1999, within the State of Maryland, Phyllis Marie Webster [hereinafter "Webster"] accepted delivery of 60 kilograms of cocaine shipped to her by CORNELIUS SINGLETON, also known as Chico, also known as Neal [hereinafter "defendant Singleton"].

4. On or about Memorial Day, 1999, within the State of Maryland, [Webster] accepted delivery of approximately 80 kilograms of cocaine shipped to her by [defendant Singleton].

5. On or about July 4, 1999, within the State of Maryland, [Webster] accepted delivery of approximately 60 kilograms of cocaine shipped to her by [defendant Singleton].

6. On or about July 9, 1999, within the State of Maryland, an individual known to the grand jury stored 229 grams of cocaine base and 1037 grams of cocaine within the State of Maryland, and said cocaine was distributed by Phyllis Marie Webster through her drug lieutenant BYRON LAMONT MCDADE, also known as Barry.

7. On or about September 28, 1999, within the District of Columbia, Phyllis Marie Webster and BYRON LAMONT MCDADE, also known as Barry, discussed by telephone the cost and amounts of prior shipments of cocaine provided to Phyllis Marie Webster by CORNELIUS SINGLETON, also known as Chico, also known as Neal.

8. On or about September 28, 1999, within the District of Columbia, [Webster] used a cellular telephone while standing outside her Midtown Café restaurant at 4306 Georgia Ave., N.W., Washington, D.C. to inform [defendant Singleton] that her records confirmed that she had received three shipments of cocaine from him since April 1999, in increments of 60, 80 and 60 kilograms.

\* \* \* \* \* \*

12. Between November and December 1999, the exact dates and places being unknown to the grand jury, [defendant Singleton] persuaded Michael Anthony Johnson, also known as Miano [hereinafter "Johnson"], to use drug proceeds to loan money to [Webster].

Each of these facts was proved at the conspiracy trial in Florida. *See supra* at 7–8. Of particular note is the testimony of Phyllis Webster—relied on heavily by the government in its closing argument—about the April, the Memorial Day and the

acy, and the government need not prove "the commission of any overt acts in furtherance of the conspiracy" to obtain a conviction. *United States v. Shabani,* 513 U.S. 10, 15, 115

S.Ct. 382, 130 L.Ed.2d 225 (1994); *see United States v. Thomas,* 114 F.3d 228, 262 (D.C.Cir. 1997); *United States v. Ramirez,* 54 F.Supp.2d 25, 30 (D.D.C.1999).

Fourth of July transactions in 1999 and the quantities, 60 kilograms in April, 80 kilograms on Memorial Day, and 60 kilograms on the Fourth of July, shipped by defendant Singleton via Ronald Lucas to Phyllis Webster on those days.

In the manner and means section of the District of Columbia indictment, the following are listed as among the manner and means used to accomplish the conspiracy and its objectives:

A. From January 1994, the exact date being unknown to the grand jury, to March 16, 2000, Cornelius Singleton, also known as Chico, also known as Neal, dispatched hundreds of kilograms of cocaine to the District of Columbia, the Commonwealth of Virginia, and the State of Maryland via courier from the State of Florida. Cornelius Singleton, also known as Chico, also known as Neal, obtained the cocaine from sources of supply in South America, the State of Florida and elsewhere, which sources of supply are not part of the conspiracy charged in this indictment.

B. Beginning in 1994, Cornelius Singleton, also known as Chico, also known as Neal, shipped via courier several hundred kilograms of cocaine from the State of Florida to Michael Anthony Johnson, also known as Miano.

C. Beginning in 1996, Cornelius Singleton, also known as Chico, also known as Neal, also shipped several hundred kilograms of cocaine from the State of Florida to Phyllis Marie Webster via courier.

D. Between 1996 and 1998, the exact date being unknown to the grand jury, Cornelius Singleton, also known as Chico, also known as Neal, shipped multiple loads totaling hundreds of kilograms of cocaine on consignment to both Phyllis Marie Webster and Michael Anthony Johnson, also known as Miano, using a single courier. Phyllis Marie Webster and Michael Anthony Johnson, also known as Miano, distributed the cocaine to their respective buyers, collected the proceeds, and kept their profit. After collecting the proceeds from each shipment, Phyllis Marie Webster and Michael Anthony Johnson, also known as Miano, paged the courier to return to the Washington, D.C. area to pick up the drug proceeds, and take the money owed for each cocaine delivery back to Cornelius Singleton, also known as Chico, also known as Neal, in Miami, Florida.

\* \* \* \* \* \*

J. In 1999, Cornelius Singleton, also known as Chico, also known as Neal, shipped Phyllis Marie Webster three loads of cocaine, totaling 200 kilograms. However, in the summer of 1999, Phyllis Marie Webster sustained losses of cash and cocaine that rendered her unable to satisfy her debt to Cornelius Singleton, also known as Chico, also known as Neal, for a large portion of these shipments.

Again, all of these allegations—specifically identified as the manner and means of accomplishing the conspiracy charged in the District of Columbia indictment—were proved at the Florida trial as conspiratorial acts engaged in by defendant Singleton, Webster, Johnson and Lucas to establish the conspiracy charged in the Florida indictment against defendant Singleton. In sum, the commonality of the "core" allegations in the District of Columbia indictment and the proof actually presented at defendant Singleton's conspiracy trial in Florida demonstrate that only one conspiracy exists for purposes of the Double Jeopardy Clause.

### 5. *Statutory Provisions*

The Florida and the District of Columbia indictments charge defendant Single-

ton with violating the exact same statute, 21 U.S.C. § 846, narcotics conspiracy, and both allege as the object of the conspiracy a violation of 21 U.S.C. § 841(a)(1). The only difference between the Florida indictment and the District of Columbia indictment is that the former charges a conspiracy to possess with the intent to distribute cocaine, while the latter charges a conspiracy both to distribute cocaine and to possess cocaine with the intent to distribute it. This is a distinction without a difference, since both distribution and possession with intent to distribute are proscribed by Section 841(a)(1). The gravamen of both conspiracies was the agreement to obtain and distribute multi-kilograms of cocaine. Defendant Singleton is charged in both indictments with the same statutory offense and with distribution of the same exact drug, powder cocaine, and with the same kilogram shipments of that powder cocaine.

The government presents two arguments in opposition to this analysis. First, it argues that the Florida indictment charged Singleton's co-defendants (but not Singleton) with two substantive narcotics violations and that these two substantive offenses do not involve any of the named indictees in the District of Columbia. This argument is irrelevant to whether charging Singleton with conspiracy in Florida and then again in the District of Columbia constitutes double jeopardy. The issue is not what others may have been charged with in the same indictment, but whether a defendant raising a double jeopardy issue has been charged with the same offense in both indictments. *See United States v. Shepard,* 89 F.Supp.2d 884, 888–89 (W.D.Mich.1999). Were it otherwise, the government would have defeated defendant's double jeopardy argument when it returned a superseding indictment in this Court on March 29, 2001, adding a second count to what had previously been a one-count conspiracy indictment in which it charged defendants Nunn and Lauren Jefferson (but not defendant Singleton) with conspiracy to launder money.

Second, the government argues that the conspiracy in Florida was in reality a conspiracy to import cocaine and that the distribution of cocaine in the District of Columbia was merely evidence relating to the importation. *See* Government Opposition to Defendant's Motion to Dismiss Count One at 9–10. The problem with this argument is that defendant Singleton was not charged in Florida with importation under 21 U.S.C. §§ 952 and 960 or with conspiracy to import under 21 U.S.C. § 963, but with conspiracy to possess with the intent to distribute cocaine under 21 U.S.C. § 846. Not only is a conspiracy to import different in kind from a conspiracy to distribute, but Congress has enacted two separate conspiracy statutes in two separate Parts of the Controlled Substances Act to govern these different conspiracies. Furthermore, the statute underlying the conspiracy charge in Florida was not the narcotics importation statute but 21 U.S.C. § 841(a), the very same statutory provision underlying the conspiracy indictment in the District of Columbia. Finally, a reading of the transcript of the Florida trial demonstrates quite clearly that the case centered around distribution, not importation.

### B. The Continuing Criminal Enterprise Charge

Defendant Singleton argues that if the Court finds that the Double Jeopardy Clause bars his prosecution in this jurisdiction for narcotics conspiracy because it is the "same offense" of which he was convicted in Florida, it necessarily follows that he cannot be prosecuted for engaging in a continuing criminal enterprise because the agreement at the heart of the CCE

charge is essentially the same agreement that underlies the conspiracy of which he was convicted in Florida. He also argues that the conspiracy is a lesser included offense of the CCE charge and that the Double Jeopardy Clause does not permit a defendant to be prosecuted for a greater offense after having been previously convicted of a lesser included offense (except in certain circumstances not relevant here). While the government acknowledges that consecutive punishments may be precluded in this case, it argues that defendant's successive prosecutions and convictions are not barred by the Double Jeopardy Clause and that double jeopardy principles do not bar the use of the Florida conspiracy as a predicate offense in the CCE prosecution.

In *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), the Supreme Court addressed the question whether a prosecution for a CCE offense after an earlier prosecution for narcotics importation violated the Double Jeopardy Clause. Because the continuing criminal enterprise—an extensive marijuana importation and distribution operation—spanned five years from 1976 to 1981, while the marijuana importation violation charge for which Garrett was indicted in 1981 occurred on a single day in 1980, the Court expressed "serious doubts" about whether the importation charge was a lesser included offense of the CCE charge. *Id.* at 790, 105 S.Ct. 2407. Assuming for purposes of analysis that it was, however, the Court nevertheless rejected the double jeopardy argument—in large part because the continuing criminal enterprise had not been completed at the time Garrett was indicted for importation. *See id.* at 791–92, 105 S.Ct. 2407. "One who insists that the music stop and the piper be paid at a particular point must at least have stopped dancing himself before he may seek such an accounting." *Id.* at 790, 105 S.Ct. 2407. Because the continuing criminal enterprise was still in progress at the time of the earlier indictment, the Court held that CCE was a separate offense that could be charged separately, and that the earlier importation charge could be used as one of the predicate offenses in the CCE prosecution. *See id.* at 792–93, 105 S.Ct. 2407. "Having concluded that Congress intended CCE to be a separate offense and that it does not violate the Double Jeopardy Clause under the facts of this case to prosecute the CCE offense after a prior conviction for one of the predicate offenses," *id.* at 793, 105 S.Ct. 2407, the Court went on to find that Congress intended to permit cumulative punishments for the underlying predicate offense and for the CCE conviction. *Id.* at 795, 105 S.Ct. 2407.[8]

The D.C. Circuit applied *Garrett* in a case arguably more analogous to this one in *United States v. Crosby*, 20 F.3d 480 (D.C.Cir.1994). It concluded that the appellants' earlier prosecutions "for single predicate acts, whatever their double jeopardy effect might be on subsequent prosecutions for overlapping simple offenses or even for section 846 conspiracy, present no bar" to a subsequent prosecution for RICO, RICO conspiracy and CCE. *Id.* at 485. The "single predicate acts" alluded to included at least one conspiracy as well

---

**8.** The Court suggested, however, that cumulative penalties might not be appropriate in the case of a conspiracy conviction and a CCE conviction. *See Garrett v. United States*, 471 U.S. at 794, 105 S.Ct. 2407 (citing *Jeffers v. United States*, 432 U.S. 137, 156–57, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977)). "[T]he plurality [in *Jeffers*] reasonably concluded that the dangers posed by a conspiracy and a CCE were similar and thus there would be little purpose in cumulating the penalties." *Garrett v. United States*, 471 U.S. at 794, 105 S.Ct. 2407.

as substantive offenses. But the conspiracy that was the subject of the prior conviction spanned less than a year—as contrasted to the nine years encompassing the CCE charge—and was "limited to the single purported object of possessing with intent to distribute a specific, albeit large, amount of cocaine on a specific date [; it] cannot be equated with the complex, extensive criminal enterprise charged" in the CCE or RICO counts. *Id.* at 486. In the circumstances, the court of appeals did not think it unreasonable to permit the government "latitude to postpone prosecution of conspiracy-wide charges such as CCE and RICO, until the conspiracy ha[d] terminated, the conspirators' particular roles [could] be more readily identified and the conspirators [could] all be indicted simultaneously." *Id.* at 487. The court held that the Double Jeopardy Clause did not bar such successive prosecutions.

In *United States v. Harvey,* 78 F.3d 501 (11th Cir.1996), the Eleventh Circuit first noted that "both a conspiracy conviction and a CCE conviction require proof of an *agreement* to violate the law," and then held that the Double Jeopardy Clause bars conviction for both conspiracy and CCE where the "same criminal agreement" forms the basis for both prosecutions. *Id.* at 505 (emphasis in original). If the conspiracy and the CCE charge are prosecuted simultaneously the conspiracy merges into the CCE; "if the prosecutions are successive, the double jeopardy clause bars the second prosecution, whichever it is." *Id.* The court then announced two caveats: Double jeopardy does not bar a second prosecution where all the overt acts had not occurred before the first case went to trial, or where, "despite due diligence, the

government has not discovered all the facts supporting the second prosecution prior to the first trial." *Id.* at 506. *See also Garrett v. United States,* 471 U.S. at 791–93, 105 S.Ct. 2407; *Brown v. Ohio,* 432 U.S. 161, 169 n. 7, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

In *Rutledge v. United States,* 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996), Rutledge was charged in Count One of the indictment with organizing and supervising a continuing criminal enterprise to distribute cocaine from 1988 to December 1990, in violation of 21 U.S.C. § 848.[9] In Count Two, he was charged with conspiring with four co-defendants and others to engage in the unlawful distribution of cocaine during the same time period, in violation of 21 U.S.C. § 846. He was convicted on both counts and sentenced to concurrent terms of life imprisonment. *See id.* at 294–95, 116 S.Ct. 1241. The Supreme Court concluded that while the CCE offense required proof of a number of elements that need not be established in a conspiracy case, a conspiracy charge under 21 U.S.C. § 846 "does not require proof of any fact that is not also a part of the CCE offense." *Id.* at 300, 116 S.Ct. 1241.[10] Having reached this conclusion, a unanimous Supreme Court went on to hold that "a straightforward application of the *Blockburger* test leads to the conclusion that conspiracy as defined in [Section] 846 does not define a different offense from the CCE offense defined in [Section] 848." *Id.* Furthermore "since the latter offense is the more serious of the two, and because only one of its elements is necessary to prove a [Section] 846 conspiracy, it is appropriate to characterize [Section] 846

---

9. *Harvey* was decided six days before *Rutledge,* but the two opinions are consistent with each other.

10. The primary basis for this conclusion was that the phrase "in concert" in the CCE statute "signifies mutual agreement in a common plan or enterprise." *Rutledge v. United States,* 517 U.S. at 300, 116 S.Ct. 1241.

as a lesser included offense of [Section] 848." *Id.* The Court held that "CCE and conspiracy are insufficiently distinct to justify a finding that Congress intended to allow punishment for both when they rest on the same activity." *Id.* at 304, 52 S.Ct. 180. Where both the narcotics conspiracy and the CCE charges are tried together, only one conviction may stand and only one punishment may be imposed. *See id.* at 305–06, 52 S.Ct. 180.

The Court in *Rutledge* specifically addressed the question whether its decision there conflicted in any way with its earlier decision in *Garrett* and concluded that it did not. The holding in *Garrett* "merely adhered to our understanding that legislatures have traditionally perceived a qualitative difference between conspiracy-like crimes and the substantive offenses on which they are predicated . . . . In contrast to *Garrett*, this case involves *two* conspiracy-like offenses directed at largely identical conduct." *Rutledge v. United States,* 517 U.S. at 300 n. 12, 116 S.Ct. 1241 (emphasis in original).

■ This case is like *Rutledge,* not like *Garrett,* because defendant Singleton was not convicted of narcotics distribution or narcotics importation in Florida, but of narcotics conspiracy. And, as this Court has held, the Florida conviction was for the same narcotics conspiracy that the grand jury charged in Count One of the indictment in this case and used as a predicate offense in Count Two. *See supra* at 14–25. Under *Rutledge,* the conspiracy is a lesser included offense of the CCE, so long as essentially the same criminal agreement forms the basis for both the conspiracy and the CCE which the Court must determine through application of the "totality of the circumstances" test.

The continuing criminal enterprise charged in Count Two of the indictment is predicated on the same conspiracy charged in Count One and on the same overt acts. In addition, all but one of the other cocaine conspiracies alleged to be predicate acts occurred within the same time frame as the Count One conspiracy: between January 1994 and other dates (but none later than March 16, 2000). The only significant difference between the CCE charge and the Florida and District of Columbia conspiracy charges is that these assertedly other conspiracies are alleged to have taken place in Tennessee, Georgia, Maryland and New York. Although the inclusion of these "new" conspiracies purports to expand the geographic scope of the CCE charge beyond the geographic area involved in Count One, it does not really do so. The Florida conspiracy charged a geographically broad distribution network by indicating that the conspiracy occurred in Florida "and elsewhere," and Count One of this indictment refers to a conspiracy in the District of Columbia, Virginia, Maryland, Florida "and elsewhere." *See* Def. Mot. Exhs. 3–5, 16–18. The CCE charge appears to focus on the very same distribution network up and down the east coast. The mere fact that the CCE count has been drafted to mention other states by name where acts in furtherance of the conspiracy allegedly took place does not *ipso facto* change the nature of the agreement. The government bears the burden of showing by a preponderance of the evidence that the two charges are really based on two separate agreements, and it has failed to do so. *See, e.g., United States v. Benefield,* 874 F.2d at 1505–06.

As for the one additional conspiracy that allegedly took place in the District of Columbia between January 1991 and November 30, 1991, which is outside the time frame of the Count One conspiracy, nothing in *Rutledge* compels the conclusion that in a case of successive prosecutions the time frames of the CCE and the previ-

ously charged narcotics conspiracy must be "coterminous" for the two offenses to be deemed "greater" and "lesser" offenses under the Double Jeopardy Clause. *See Rutledge v. United States*, 517 U.S. at 304, 116 S.Ct. 1241. Indeed, as defendant points out, any such requirement would allow the government to manipulate the charging process by changing ever so slightly the dates, the list of conspirators, or the overt acts, thereby obtaining multiple convictions for what is in reality one conspiratorial agreement. *See United States v. Mallah*, 503 F.2d at 982, 985; *Short v. United States*, 91 F.2d at 624. In this case, the predicate violations are the Count One conspiracy, a number of the Count One overt acts, and various other narcotics conspiracies, all but one of which allegedly began on or about January 1994, the beginning date of the Count One conspiracy, and all of which ended no later than March 16, 2000, when the Count One conspiracy allegedly concluded. "[T]he evidence of distinctness to which the government points is not considerable." *United States v. Mallah*, 503 F.2d at 986.

The other factors that are relevant for consideration under the "totality of the circumstances" test also weigh in defendant's favor. The government has proffered no evidence to dispute the fact that there is significant overlap between the conspirators in the Florida and District of Columbia conspiracy and the CCE charged in Count Two, and it does not dispute that the 150 kilograms or more alleged in the CCE charge are the exact same 150 kilograms that were central to its conspiracy prosecution in Florida and Count One here: the April, Memorial Day and Fourth of July shipments in 1999 (Overt Acts 3, 4 and 5). *See* Def. Mot. Exh. 14 at 2–3. *See supra* at 7. Furthermore, the only overt acts mentioned in the CCE count are the very same overt acts that underlie Count One and none other, and the Count One conspiracy, the other conspiracies (with one exception noted above) and the CCE are alleged to have taken place contemporaneously. In the absence of any evidence from the government illustrating how these supposedly other conspiracies are different from the Count One conspiracy and thus make the agreement at the heart of the CCE count separate and distinct from the agreement in the Florida and District of Columbia conspiracy, a fair application of the "totality of the circumstances" test necessarily leads to the conclusion that the same conspiratorial agreement underlies the Florida conspiracy, the Count One conspiracy and the CCE charge.

Like *Rutledge* and unlike *Garrett*, this case involves two conspiracy-like offenses directed at largely identical conduct. *Rutledge v. United States*, 517 U.S. at 300 n. 12. As in *Rutledge*, because the Section 848 CCE and the Section 846 conspiracy involved the same conspiratorial agreement, the former is a lesser included offense of the latter, *see id.* at 300, 116 S.Ct. 1241, and these crimes are "insufficiently distinct" to justify a finding that Congress intended to allow punishment for both. *Id.* at 304, 116 S.Ct. 1241. While *Rutledge* itself did not deal with successive prosecutions, the logic of *Rutledge* and the values underlying the Double Jeopardy Clause lead to the conclusion that a successive prosecution for CCE after a conviction for conspiracy is not permissible. *Id.* at 305–06, 116 S.Ct. 1241. As the Eleventh Circuit put it: "[I]f the prosecutions are successive"—as they are here—"the double jeopardy clause bars the second prosecution, whichever it is." *United States v. Harvey*, 78 F.3d at 506.[11] Because defen-

---

11. The D.C. Circuit's decision in *Crosby* does not require a different conclusion. The predi-

dant Singleton has already been prosecuted for, convicted of and punished for the conspiracy, the CCE prosecution is barred by double jeopardy.

The Eleventh Circuit would recognize exceptions to the *Rutledge–Harvey* rule where either all the overt acts had not occurred before the first case went to trial or where, despite due diligence, the government had not discovered all the facts surrounding the second prosecution before the first trial. *United States v. Harvey,* 78 F.3d at 506. In this case, neither exception applies because the government relies on the very same overt acts in Count Two as it does in Count One and on the Count One conspiracy and additional conspiracies all of which are alleged to have ended on the very same date as the Count One conspiracy. And the government has not suggested that the additional alleged conspiracies were not known to them at the time of the trial in Florida or at the time of the original indictment in this case. While the CCE count alleges supposedly separate conspiracies in "Tennessee and elsewhere," "Georgia and elsewhere," "Maryland and elsewhere," and "New York and elsewhere," all but one began and ended during the exact same time frame covered by the conspiracy that allegedly took place in the District of Columbia, the Eastern District of Virginia, the District of Maryland, the Southern District of Florida "and elsewhere." The government has made no showing that the new predicate conspiracies were not part of the Florida and D.C. conspiracies already charged or that the government discovered evidence of these conspiracies only after defendant's indictment or conviction in Florida. *See United States v. Harvey,* 78 F.3d at 506; *United States v. Boldin,* 772 F.2d 719,

731–32 (11th Cir.1985); *compare United States v. Crosby,* 20 F.3d at 487 (not unreasonable to postpone prosecution until conspiracy had terminated, conspirators' roles could be identified, and conspirators could all be indicted together).

For the foregoing reasons, both Count One and Count Two of the indictment must be dismissed on double jeopardy grounds. An appropriate Order will be issued this same day.

SO ORDERED.

---

cate offense there was a conspiracy in name but was much more akin to the importation charge in *Garrett.* It spanned less than a year and "was limited to the single purported object of possessing with intent to distribute a specific, albeit large, amount of cocaine on a specific date." *United States v. Crosby,* 20 F.3d at 486.